UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALEX BENDER,                          :
                                      :
          Plaintiff                   :     NO. 1:12-CV-01198-SHR
                                      :     (Judge Sylvia H. Rambo)
     vs.                              :
                                      :
NORFOLK SOUTHERN CORPORATION          :
and NORFOLK SOUTHERN                   :
RAILWAY COMPANY,                      :
                                      :
          Defendants                  :

PLAINTIFF'S BRIEF IN OPPOSITION TO
MOTION OF DEFENDANTS FOR SUMMARY JUDGMENT

Dennis J. Shatto, Esquire
PA Attorney ID #25675
CLECKNER AND FEAREN
119 Locust Street
P. O. Box 11847
Harrisburg, PA   17108-1847
Tele:   (717) 238-1731
Fax:    (717) 238-8481
E-mail: dennisshatto@hotmail.com

Attorneys for Plaintiff,
Alex Bender

## **TABLE OF CONTENTS**

I.    COUNTER STATEMENT OF FACTS ........................    1

II.   ARGUMENT .........................................    2

      A.    Defendant's Reliance Upon a Qualification
            Standard is Improper. .......................    2

      B.    Burden of Proof .............................    6

      C.    Failure to Accommodate ......................   10

      D.    Defendant Did Not Conduct an Individualized
            Assessment. .................................   15

III.  CONCLUSION .......................................   16

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Atkins v. Salazar*,
   677 F.3d 667 (5th Cir. 2011) ......................    5

*Bombrys v. City of Toledo*,
   849 F.Supp. 1210 (N.D. OH 1993) ..................    3

*Bosket v. Long Island RR*,
   2004 U.S. Dist. LEXIS 10851 (E.D. NY 2004) .......    8

*Branham v. Snow*,
   392 F.3d 896 (7th Cir. 2004) .....................    5, 6, 7,
                                             8, 9, 15

*Bymum v. MVM*,
   462 F. Supp. 2d 9 (D. DC 2008) ...................    9

*Clark v. Septa*,
   2008 U.S. Dist. LEXIS 5466 (E.D. Pa. 2008) .......    6

*DiPol v. NYC Transit Authority*,
   999 F. Supp. 309 (E.D. NY 1998) .................    9, 15

*Echazabal v. Chevron USA*,
   336 F.3d 1023 (9th Cir. 2003) .....................    6, 15

*EEOC v. Hussey Cooper, Ltd.*,
   2010 U.S. Dist. LEXIS 22920 (W.D. Pa. 2010) ......    6, 16

*EEOC v. Wal-mart Stores, Inc.*,
   477 F.3d 561 (8th Cir. 2007) .....................    6

*Gaus v. Norfolk Southern Railway Co.*,
   2011 U.S. Dist. LEXIS 11089 (W.D. Pa. 2011) ......    15

*Gillen v. Fallon Ambulance Service*,
   283 F.3d 11 (1st Cir. 2002) ......................    15

*Hargrave v. Vermont*,
   340 F.3d 27 (2nd Cir. 2003) ......................    6

*Hutton v. Elf Atochem N. America, Inc.*,
   273 F.3d 884 (9th Cir. 2001) .....................    7

*Jackson v. City of New York*,
  2011 U.S. Dist. LEXIS 43861 (E.D. NY 2011) .......   5

*Kapche v. City of San Antonio*,
  304 F.3d 493 (5th Cir. 2002) .....................   3

*Lane v. Harborside Healthcare-Westwood Rehab and
  Nursing Center*, 2002 U.S. Dist. LEXIS 13568
  (D. NH 2002) ....................................   8

*Lewis v. Pennsylvania*,
  2010 U.S. Dist. LEXIS 127154 (W.D. Pa. 2010) .....   8

*McCusker v. Lakeview Rehab Center*,
  203 U.S. Dist. LEXIS 16340 (D. NH 2003) ..........   9

*Millage v. City of Suioux City*,
  258 F.2d 976 (N.D. IO 2003) .....................   3, 9

*Rizzo v. Children's World Learning Center, Inc.*,
  84 F.3d 758 (5th Cir. 1996) .....................   6

*Simms v. City of New York*,
  160 F.Supp. 2d 398 (E.D. NY 2001) ...............   9

*Verzeni v. Potter*,
  109 Fed. Appx. 485 (3rd Cir. 2004 (dicta)) ........   6

**Statutes**

42 U.S.C.S. § 12111(10) ..........................   13

**Other Authorities**

19. C.F.R. 1630.2(r) .............................   5, 6, 7

American Diabetes Association, *Diabetes Care*,
  Volume 36, Supp. 1, January, 2013,
  "Diabetes and Employment" ......................   3, 9

## I.    COUNTER STATEMENT OF FACTS

Plaintiff does not dispute most of the basic facts set forth in Defendant's Brief.

On page 3 of the Brief, Defendant quotes from Dr. Caruso's letter dated November 16, 2010, but does not properly identify the end of the quotation.  The full last paragraph of the letter states as follows:

> I feel Alex is very capable of performing the essential functions of the job provided he is able to eat regularly scheduled meals and has access to glucose tablets to take as needed for infrequent hypoglycemic episodes.

*Caruso Deposition,* Ex. FPC0209.

In her response to Defendant's follow-up letter dated November 19, 2010, Dr. Caruso stated that "Alex experiences hypoglycemia approximately 1-2 times a month at night" and "Alex will need to eat breakfast, lunch and dinner daily as well as have access to glucose supplementation as needed if he experiences hypoglycemia. His meals need to occur at regularly scheduled times daily." *Caruso Deposition,* Ex. 5.

Defendant's letter to Plaintiff dated December 3, 2010, notifying him that he was disqualified, states that the "disqualification is based upon a review of your pre-placement physical examination." *Bender Deposition,* Ex. 6.

Dr. Prible's testimony that he concluded that Plaintiff was not medically qualified because his diabetes was not under good control or stable, which Defendant's medical guidelines required,

- 1 -

is inconsistent with the letter to Plaintiff dated December 3, 2010, and the guidelines are not part of the record.

The remainder of the "facts" in Defendant's Brief are recitations of Dr. Prible's testimony about what he thought and concluded more than two years earlier. These thoughts and conclusions were not documented at the time and cannot possibly be proven or disproven, other than through Dr. Prible's testimony. The finder of fact is not obligated to accept such testimony, particularly when it is inconsistent with the letter of disqualification dated December 3, 2010.

## II.   ARGUMENT

### A.   DEFENDANT'S RELIANCE UPON A QUALIFICATION STANDARD IS IMPROPER.

Defendant attempts to rely upon a qualification standard to justify its decision not to hire Plaintiff. While this standard is presumably in written form, it was never made a part of the record. Since the written version of the standard or guideline is the best evidence of its content, without it review or analysis of this standard is impossible. Indeed, it is difficult to discern the content of the standard from the record. On page 9 of the brief, Defendant suggests that the guideline is "good control and stable" diabetes. On page 8 of the brief, Defendant states that "NSRC likes to see that a diabetic individual's blood sugars are

consistently below 200, which shows they are controlled, and that the diabetic individual is not having regular hypoglycemic episodes." Reference is also made to average glucose readings through a Hemoglobin A1C test. *Brief*, p. 8.

Medical standards that screen out people with diabetes have been struck down on the basis that they do not meet the Act's requirement for and focus upon an individualized assessment. *Kapche v. City of San Antonio*, 304 F.3d 493 (5th Cir. 2002); *Bombrys v. City of Toledo*, 849 F.Supp. 1210 (N.D. OH 1993); *Millage v. City of Suioux City*, 258 F.2d 976 (N.D. IO 2003).

The American Diabetes Association, in its position statement "Diabetes and Employment," published in *Diabetes Care*, Volume 36, Supp. 1, January, 2013, states that the AIC test "does not provide useful information on whether the individual is at significant risk for hypoglycemia or sub-optimal job performance and is not a measure of 'compliance' with therapy." The statement goes on to provide as follows regarding "control" of diabetes:

> Sometimes an individual's diabetes is described as 'uncontrolled,' 'poorly controlled,' or 'brittle.' These terms are not well-defined and are not relevant to job evaluations. As such, giving an opinion on the level of 'control' an individual has over diabetes is not the same as assessing whether that individual is qualified to perform a particular job and can do so safely. Such an individual assessment is the only relevant evaluation.

Here, the Defendant's purported standard is vague, and caters to the stereotypes about diabetics. Use of such a standard is precisely the kind of harm the Act was adopted to remedy.

This point can be convincingly illustrated by reference to the record in the instant case.

Dr. Caruso's records contain references to Plaintiff's diabetes being under control (e.g., *Caruso Deposition,* Ex. FPC 0004, 0019, 0059, 0160, 0201), and poorly controlled (e.g., *Caruso Deposition,* Ex. FPC 0163). When asked if there is a medical definition of "uncontrolled" diabetes, Dr. Caruso responded that it is a "gray" area and it is different for every physician and every patient. (*Caruso Deposition,* pp. 78, 79). She also confirmed that references to poorly controlled diabetes refer to high blood sugar. "You don't typically relate people's low blood sugars being uncontrolled." (*Caruso Deposition,* p. 80). See, also, page 64, where Dr. Caruso testifies that her references to Plaintiff having good control related to hypoglycemia or low blood sugar. She goes on to state that "low blood sugars are a much bigger problem than high blood sugars." (*Caruso Deposition,* p. 65). Dr. Caruso testified that poor control of diabetes increases the risk of long term complications of hyperglycemia, but actually lessens the risk of hypoglycemia. (*Caruso Deposition,* pp. 72-73; p. 57). Dr. Caruso also testified that Plaintiff is aware of his infrequent hypoglycemic episodes, and that there is a dramatic difference in danger with people who are not aware of the episodes and cannot, therefore, treat them. (*Caruso Deposition,* pp. 44, 45). When asked why Plaintiff experiences hypoglycemia at night, Dr. Caruso opined that his pump may have been providing too much insulin, or

- 4 -

that he had not eaten enough to keep his blood sugars higher throughout the night. (*Caruso Deposition,* p. 40). Dr. Prible, Defendant's physician, was not surprised that Plaintiff suffers from hypoglycemia at night. (*Prible Deposition*, p. 37).

Defendant relies upon *Atkins v. Salazar*, 677 F.3d 667 (5th Cir. 2011). *Atkins* is an unpublished opinion. *Atkins* is easily distinguishable. The employee routinely experienced hypoglycemic episodes during work and was unable to sense the approach of a hypoglycemic episode. Plaintiff here, on the other hand, has never experienced symptoms of hypoglycemia during work and has a good awareness of his blood sugar level.

It is Plaintiff's position that Defendant's purported standard or guideline is inconsistent with the Act's requirement for an individualized assessment, and therefore invalid. As a result, the Court should apply the "direct threat" standard in evaluating this case.[1]

"Direct threat" is defined as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. 1630.2(r). The relevant question is not whether any risk exists, but whether that risk is significant. *Branham v. Snow*, 392 F.3d 896 (7th Cir. 2004). In *Jackson v. City*

---

[1] When employers have medical standards which apply to hiring practices, the "business necessity" defense is used, but the considerations underlying "direct threat" are still relevant to analyzing safety.

*of New York*, 2011 U.S. Dist. LEXIS 43861 (E.D. NY 2011), the Court rejected the defendant's claim that the plaintiff might experience future seizures related to diabetes.   The Court noted that more than a remote risk is required to constitute a direct threat. There must be a high probability of substantial harm.  *Appendix II*, Part 1630, *Interpretive Guidance*, 29 C.F.R. 1630.2(r); *EEOC v. Hussey Cooper, Ltd.*, 2010 U.S. Dist. LEXIS 22920 (W.D. Pa. 2010). Generalized statements about potential harm which are not based on information about the individual are insufficient.  *Echazabal v. Chevron USA,* 336 F.3d 1023 (9th Cir. 2003); *Hussey Cooper,* supra. It seems obvious that there cannot be a high probability of substantial harm when Plaintiff has <u>never</u> had a severe or even significant hypoglycemic episode.


B.   <u>**BURDEN OF PROOF**</u>

Defendant argues that Plaintiff has the burden of proving that he or she is not a direct threat.  Courts in several circuits have so held.  However, most courts have found that direct threat is an affirmative defense for which the employer has the burden of proof. *Hargrave v. Vermont*, 340 F.3d 27 (2nd Cir. 2003); *Clark v. Septa*, 2008 U.S. Dist. LEXIS 5466 (E.D. Pa. 2008); *Verzeni v. Potter*, 109 Fed. Appx. 485 (3rd Cir. 2004 (dicta)); *Rizzo v. Children's World Learning Center, Inc.*, 84 F.3d 758 (5th Cir. 1996); *Branham v. Snow*, supra.; *EEOC v. Wal-mart Stores, Inc.*, 477 F.3d 561 (8th Cir. 2007);

*Hutton v. Elf Atochem N. America, Inc.*, 273 F.3d 884 (9th Cir. 2001).

If Plaintiff bears the burden, he has carried it. He has held jobs as a truck driver and deputy sheriff, without ever suffering a hypoglycemic episode at work. He has never had a significant[2] or severe hypoglycemic episode, evidenced by his testimony that he has never lost consciousness or become confused. (*Bender Deposition,* pp. 25, 27, 60). Plaintiff's testimony, and that of Dr. Caruso, establish that he would be no threat at all.

Plaintiff contends that Defendant has the burden of proof. Under 29 C.F.R. 1630.2(r), the factors to be considered in determining whether an employee would pose a direct threat include (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm.

Since Plaintiff has never had symptoms of severe hypoglycemia, it is difficult to evaluate the first factor. When he has mild hypoglycemia at night, he is able to recognize it and treat it promptly. Accordingly, if his risk has any duration, it is very short. *See, Branham v. Snow, supra.* In its brief, Defendant states that Dr. Caruso testified that Plaintiff experiences "severe" hypoglycemic episodes twice a month. (*Brief,* at 17).

---

[2] Dr. Prible defined "significant hypoglycemic episode" as "one in which somebody physically becomes impaired to the point it could affect their judgment, their alertness, awareness . . .." (*Prible Deposition,* p. 24).

Defendant cites to undisputed Material Facts 60-61, which contain no such statement.    Undisputed fact 61 cites to Dr. Caruso's deposition and to her medical records. Nowhere in any document in the record does Dr. Caruso describe Plaintiff's nighttime hypoglycemic episodes as "severe." Indeed, it would be inaccurate to characterize Plaintiff's episodes as "severe," since they are not, and have been successfully treated with glucose tablets and have never recurred, even after many hours. *(Bender Declaration,* ¶¶ *5, 6)*.

The next factor is the severity of the risk.    It is true that an accident involving a train could cause severe harm.    The relevant inquiry, however, is the severity of the risk, not the severity of the harm.    Severity of harm is not an independent avenue to summary judgment, and standing alone, does not warrant a finding that the employee is not qualified for the job. *Lewis v. Pennsylvania*, 2010 U.S. Dist. LEXIS 127154 (W.D. Pa. 2010); *Bosket v. Long Island RR*, 2004 U.S. Dist. LEXIS 10851 (E.D. NY 2004). *See, also, Branham v. Snow,* supra., where the plaintiff, a diabetic, had never lost consciousness or experienced incapacitation, as is the case with Plaintiff Bender. It should be noted, also, that Plaintiff would not be working alone and others could assist in the event of an emergency or simply cease all activity. *(Declaration of Charles L. Heiney, ¶¶ 5, 8, 17)*. These facts lessen the risk. *Lane v. Harborside Healthcare-Westwood Rehab and Nursing Center*, 2002 U.S. Dist. LEXIS 13568 (D. NH 2002).

- 8 -

The third factor is the likelihood of harm.

In *Branham v. Snow,* supra, summary judgment was denied to the defendant where the plaintiff had never suffered incapacitation and there was no medical evidence indicating that he would do so in the future.   In *DiPol v. NYC Transit Authority*, 999 F. Supp. 309 (E.D. NY 1998), the Court noted that the plaintiff had never experienced problems on the job related to his diabetes.   Although there was speculation by the defendant regarding possible safety concerns, there was no evidence demonstrating that the plaintiff's diabetes rendered him incapable of performing his job responsibilities. *See, also, Simms v. City of New York,* 160 F.Supp. 2d 398 (E.D. NY 2001); *Bymum v. MVM,* 462 F. Supp. 2d 9 (D. DC 2008); *Millage v. City of Sioux City,* supra, where summary judgment was denied despite the fact that the plaintiff had experienced a hypoglycemic reaction while operating a bus; *McCusker v. Lakeview Rehab Center*, 203 U.S. Dist. LEXIS 16340 (D. NH 2003) (defendant's motion to dismiss denied despite plaintiff's multiple hypoglycemic incidents on the job, one leading to an automobile accident).

Most diabetics never experience an episode of severe hypoglycemia, and most can manage their condition in such a manner that there is minimal risk of incapacitation because mildly low glucose levels can be easily detected and treated.   *American Diabetes Association, Physician Statement,* supra.

Defendant argues that even the shift in focus to obtain glucose "is likely to cause an accident." (*Brief,* p. 18).   This is

- 9 -

pure speculation, unsupported by any evidence in the record.  Even in the unlikely event Plaintiff had symptoms of mild hypoglycemia at work, there was no evidence as to how quickly his condition would become significant or severe.

### C.    **FAILURE TO ACCOMMODATE**

Defendant contends that Plaintiff's "need to eat meals on a regular basis" could not be accommodated by Defendant.  In support of this argument, Defendant makes the following contentions:  (1) the need to eat regular meals accommodation is not reasonable in the railroad environment; (2) the accommodation, even if provided, would not eliminate the risk; (3) providing such an accommodation would impose an undue hardship upon Defendant.

First of all, Dr. Caruso's statement that Plaintiff could perform the essential functions of the job of conductor as long as he could eat meals at regularly scheduled times has been misconstrued.  Defendant argues that when Dr. Caruso used the term "meals" she admitted that she was not talking about having a snack, a candy bar, or a banana.  *Brief*, at 22.  Defendant has selectively cited to Dr. Caruso's testimony.  The complete exchange follows, at pages 47 and 48 of Caruso's deposition:

Q.   Okay.  And you're not talking about a snack, having a candy bar, having a banana.  You're talking about eating a meal?

A.   Yes.

Q.   Okay.

A.   <u>Or a set amount of carbohydrate.</u>

Q.   <u>Okay.   Now, when you say set amount of carbohydrate, what are you meaning?</u>

A.   <u>Typically, you want somebody to eat about 60 grams of carbohydrate with a meal as a diabetic.</u>

Q.   <u>Okay.</u>

A.   <u>And frankly, that can be done by drinking half a bottle of Mountain Dew or sitting down and actually having a meal, depending on the amount of carbohydrate in what you're consuming.</u>   (Emphasis added.)

Dr. Caruso further clarified this testimony at page 82 of her deposition transcript.  She was asked what she means by a meal, and responded, in part, as follows:

> Again, he should be consuming 60 grams of carbohydrates when he eats.  I guess meals might have been a strong thing to say, because he could have done that in half a bottle of Mountain Dew.

Dr. Caruso explained that eating something with carbohydrates and protein is preferred so that the blood sugar level will come back down in a more steady fashion.  She specifically mentioned, at page 84, that a Snickers bar, which has peanuts or fats, would cause the carbohydrates to absorb slower.

Conductors routinely carry lunch with them, and eat when they can.  *Declaration of Charles L. Heiney*, ¶¶ 5, 6, 7, 13, 16.  If a "meal time" is not available, they simply consume food while seated in the cab or elsewhere.  It takes very little time to eat a sandwich and drink a soda.  The work is never so intense that more

than 10 or 15 minutes would elapse without a conductor having an opportunity to consume food. *Declaration of Charles L. Heiney*, ¶ 16.

Accordingly, Defendant's first contention, that there is no guarantee of a meal break, and there are times when the work is too intense to eat, is unavailing. There is nothing to support the suggestion that Plaintiff needs a "meal break." He merely needs to consume some food, within a window of opportunity of a couple of hours. *Caruso Deposition,* p. 55. That he would have such an opportunity seems obvious, but is established by the Declaration of L. Charles Heiney. See, also, *Declaration of Dave Baxter,* ¶ 6. In the rare event of an urgent situation, activity would simply stop for few minutes while the employee eats a candy bar (or goes to the bathroom). *Declaration of Charles L. Heiney,* ¶ 9.

Defendant also argues that Plaintiff admitted that his need to eat meals at regularly scheduled times could not be accommodated by Defendant. *Brief*, at p. 22. It is obvious from a review of Plaintiff's deposition transcript that he was merely repeating information which had been provided to him by employees of Defendant. This explanation is provided at paragraph 7 of his declaration.

Defendant's second contention is that the accommodation, if provided, would not eliminate the risk in any event. In this regard, Defendant contends that Plaintiff had hypoglycemic episodes even when he ate regularly. The only time Plaintiff has had

hypoglycemia is while asleep at night, and the symptoms are mild. He has never had a significant or severe hypoglycemic episode, and he has never had even a mild hypoglycemic episode at work or when awake.  There is really no risk to be eliminated.

The third contention is that allowing Plaintiff to have a meal at a regularly scheduled time would impose an undue hardship upon Defendant.  Defendant argues that allowing Plaintiff a meal time would adversely affect his coworkers.  If Plaintiff needed to take a few minutes to eat a meal, and activity had to stop while he did so, there is no factual basis for Defendant's contention. Defendant assumes, without providing any factual support, that Plaintiff's coworkers would have to cover his responsibilities. Defendant cites to Material Fact No. 48 in support of its contention that allowing some time for Plaintiff to consume food would disrupt business operations.  Nothing in Fact No. 48 supports that statement.

More importantly, Defendant fails to address the factors in the Act for determining whether an accommodation would result in an undue hardship.

The definition of "undue hardship" is set forth in 42 U.S.C.S. 12111(10) as follows:

I.   Undue hardship.

(A)  In general.  The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B).

    (B)   Factors to be considered.  In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include--

        (i)   the nature and cost of the accommodation needed under this Act;

        (ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources; or the impact otherwise of such accommodation upon the operation of the facility;

      (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

      (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

A review of the factors leads to the obvious conclusion that the analysis is financial in nature.  Defendant has provided no financial information whatsoever and, therefore, fails to establish that accommodating Plaintiff would impose an undue hardship.

The record simply does not establish that the unlikely need for work stoppage for a few minutes would cause an undue hardship.

The fourth factor is the imminence of harm.  Defendant spent little time discussing this factor (*Brief,* at p. 20).  Defendant states that Bender was averaging two hypoglycemic episodes a month, and that his inability to eat on a regular basis "increased the

risk" of hypoglycemic episode.  (*Brief,* at p. 20).  Defendant
somehow concludes, from those facts, that the harm is imminent.  In
*Branham v. Snow, supra.,* the risk was not imminent because the
plaintiff had never suffered harm at work, and could recognize and
treat symptoms of hypoglycemia.  In *Gaus v. Norfolk Southern
Railway Co.,* 2011 U.S. Dist. LEXIS 11089 (W.D. Pa. 2011), the harm
from drowsiness which might be caused by pain medications was not
imminent because there was no evidence that the symptoms would
arise suddenly and without warning.

In the instant case, there is no evidence in the record to
support the conclusion that harm is imminent.

### D.    **DEFENDANT DID NOT CONDUCT AN INDIVIDUALIZED ASSESSMENT.**

The employer is obliged to conduct an individualized
assessment of the Plaintiff.  Such an assessment requires
consideration of information about an employee's past work history.
*DiPol v. NYC Transit Authority, supra.; Echazabal v. Chevron USA,
supra.; Gillen v. Fallon Ambulance Service,* 283 F.3d 11 (1st Cir.
2002).  Defendant's physician, Dr. Prible, admitted that Defendant
made no inquiry regarding hypoglycemic episodes in Plaintiff's work
history.  (*Prible Deposition,* p. 38).  This deficiency alone
renders the Defendant's assessment of Plaintiff inadequate.

Moreover, where (as here) the condition varies from person to
person, the employer must assess the impairment in the employee's

own experience.   *EEOC v. Hussey Cooper Ltd.,* supra.   This was not done.


III.   **CONCLUSION**


Plaintiff respectfully contends that there are material facts in dispute, and that for the foregoing reasons, Defendant is not entitled to summary judgment.


Respectfully submitted this __4ᵗʰ__ day of November, 2013.


CLECKNER AND FEAREN

By _____
        Dennis J. Shatto, Esquire
        PA Attorney ID #25675

Attorneys for Plaintiff,
Alex Bender


- 16 -

ATTACHMENT TO PLAINTIFF'S BRIEF

IN OPPOSITION TO

MOTION OF DEFENDANTS FOR SUMMARY JUDGMENT

# Diabetes and Employment

AMERICAN DIABETES ASSOCIATION

A s of 2010, nearly 26 million Americans have diabetes (1), most of whom are or wish to be participating members of the workforce. Diabetes usually has no impact on an individual's ability to do a particular job, and indeed an employer may not even know that a given employee has diabetes. In 1984, the American Diabetes Association adopted the following position on employment:

> Any person with diabetes, whether insulin [treated] or non–insulin [treated], should be eligible for any employment for which he/she is otherwise qualified.

Questions are sometimes raised by employers about the safety and effectiveness of individuals with diabetes in a given job. When such questions are legitimately raised, a person with diabetes should be individually assessed to determine whether or not that person can safely and effectively perform the particular duties of the job in question. This document provides a general set of guidelines for evaluating individuals with diabetes for employment, including how an assessment should be performed and what changes (accommodations) in the workplace may be needed for an individual with diabetes.

## I. EVALUATING INDIVIDUALS WITH DIABETES FOR EMPLOYMENT—It was once common practice to restrict individuals with diabetes from certain jobs or classes of employment solely because of the diagnosis of diabetes or the use of insulin, without regard to an individual's abilities or circumstances. Such "blanket bans" are medically inappropriate and ignore the many advancements in diabetes management that range from the types of

medications used to the tools used to administer them and to monitor blood glucose levels.

Employment decisions should not be based on generalizations or stereotypes regarding the effects of diabetes. The impact of diabetes and its management varies widely among individuals. Therefore, a proper assessment of individual candidates for employment or current employees must take this variability into account.

In addition, federal and state laws require employers to make decisions that are based on assessment of the circumstances and capabilities of the individual with diabetes for the particular job in question (2,3). Application of blanket policies to individuals with diabetes results in people with diabetes being denied employment for which they are well qualified and fully capable of performing effectively and safely. It should be noted that, as a result of amendments to the Americans with Disabilities Act, which became effective on 1 January 2009, all persons with diabetes are considered to have a "disability" within the meaning of that law. This is because, among other reasons, diabetes constitutes a substantial limitation on endocrine system functioning—the Act was amended to extend its coverage to persons with a substantial limitation in, among other things, a major bodily function, such as the endocrine system. Therefore, persons with diabetes are protected from discrimination in employment and other areas. The amendments overturned a series of Supreme Court decisions that had severely narrowed who was covered by the law and resulted in many people with diabetes and other chronic illnesses being denied protection from discrimination. This section provides an overview of the factors relevant to a medically appropriate

individualized assessment of the candidate or employee with diabetes.

## Role of diabetes health care professionals
When questions arise about the medical fitness of a person with diabetes for a particular job, a health care professional with expertise in treating diabetes should perform an individualized assessment. The involvement of the diabetes health care professional should occur before any adverse employment decision, such as failure to hire or promote or termination. A health professional who is familiar with the person with diabetes and who has expertise in treating diabetes is best able to perform such an assessment. In some situations and in complex cases, an endocrinologist or a physician who specializes in treating diabetes or its complications is the best qualified health professional to assume this responsibility (4). The individual's treating physician is generally the health care professional with the best knowledge of an individual's diabetes. Thus, even when the employer utilizes its own physician to perform the evaluation, the opinions of the treating physician and other health care professionals with clinical expertise in diabetes should be sought out and carefully considered. In situations where there is disagreement between the opinion of the employee's treating physician and that of the employer's physician, the evaluation should be handed over to an independent health care professional with significant clinical expertise in diabetes.

## Individual assessment
A medical evaluation of an individual with diabetes may occur only in limited circumstances (3). Employers may not inquire about an individual's health status—directly or indirectly and regardless of the type of job—before making a job offer, but may require a medical examination or make a medical inquiry once an offer of employment has been extended and before the individual begins the job.

Revised Fall 2009.
DOI: 10.2337/dc13-S093
© 2013 by the American Diabetes Association. Readers may use this article as long as the work is properly cited, the use is educational and not for profit, and the work is not altered. See http://creativecommons.org/licenses/by-nc-nd/3.0/ for details.

The job offer may be conditioned on the results of the medical inquiry or examination. An employer may withdraw an offer from an applicant with diabetes only if it becomes clear that he or she cannot do the essential functions of the job or would pose a direct threat (i.e., a significant risk of substantial harm) to health or safety and such threat could not be eliminated with an accommodation (a workplace change that enables a worker with a disability to safely and effectively perform job duties). Another situation in which a medical evaluation is permissible is when a problem potentially related to the employee's diabetes arises on the job and such problem could affect job performance and/or safety. In this situation, a physician may be asked to evaluate the employee's fitness to remain on the job and/or his or her ability to safely perform the job.

Employers also may obtain medical information about an employee when the employee has requested an accomodation and his or her disability or need for accommodation is not obvious. An employer should not rely on a medical evaluation to deny an employment opportunity to an individual with diabetes unless it is conducted by a health care professional with expertise in diabetes and based on sufficient and appropriate medical data. The information sought and assessed must be properly limited to data relevant to the individual's diabetes and job performance (3). The data needed will vary depending on the type of job and the reason for the evaluation, but an evaluation should never be made based only on one piece of data, such as a single blood glucose result or A1C result. Since diabetes is a chronic disease in which health status and management requirements naturally change over time, it is inappropriate—and medically unnecessary—for examiners to collect all past laboratory values or information regarding office visits whether or not related to diabetes. Only medical information relevant to evaluating an individual's current capacity for safe performance of the particular job at issue should be collected. For example, in some circumstances a review of an individual's hypoglycemia history may be relevant to the evaluation and should be collected.

Information about the individual's diabetes management (such as the current treatment regimen, medications, and blood glucose logs), job duties, and work environment are all relevant factors to be considered. Only health care professionals tasked with such evaluations should have access to employee medical information, and this information must be kept separate from personnel records (3).

## Screening guidelines

A number of screening guidelines for evaluating individuals with diabetes in various types of high risk jobs have been developed in recent years. Examples include the American College of Occupational and Environmental Medicine's National Consensus Guideline for the Medical Evaluation of Law Enforcement Officers, the National Fire Protection Association's Standard on Comprehensive Occupational Medical Program for Fire Departments, the U.S. Department of Transportation's Federal Motor Carrier Safety Administration's Diabetes Exemption Program, and the U.S. Marshall Service and Federal Occupational Health Law Enforcement Program Diabetes Protocol.

Such guidelines and protocols can be useful tools in making decisions about individual candidates or employees if they are used in an objective way and based on the latest scientific knowledge about diabetes and its management. These protocols should be regularly reevaluated and updated to reflect changes in diabetes knowledge and evidence and should be developed and reviewed by health care professionals with significant experience in diabetes and its treatment. Individuals who do not meet the standards set forth in such protocols should be given the opportunity to demonstrate exceptional circumstances that would justify deviating from the guidelines. Such guidelines or protocols are not absolute criteria but rather the framework for a thorough individualized assessment.

## Recommendations

- People with diabetes should be individually considered for employment based on the requirements of the specific job and the individual's medical condition, treatment regimen, and medical history. (E)
- When questions arise about the medical fitness of a person with diabetes for a particular job, a health care professional with expertise in treating diabetes should perform an individualized assessment; input from the treating physician should always be included. (E)
- Employment evaluations should be based on sufficient and appropriate medical data and should never be made based solely on one piece of data. (E)
- Screening guidelines and protocols can be useful tools in making decisions about employment if they are used in an objective way and based on the latest scientific knowledge about diabetes and its management. (E)

## II. EVALUATING THE SAFETY RISK OF EMPLOYEES WITH DIABETES—Employers who deny job opportunities because they perceive all people with diabetes to be a safety risk do so based on misconceptions, misinformation, or a lack of current information about diabetes. The following guidelines provide information for evaluating an individual with diabetes who works or seeks to work in what may be considered a safety-sensitive position.

### Safety concerns

The first step in evaluating safety concerns is to determine whether the concerns are reasonable in light of the job duties the individual must perform. For most types of employment (such as jobs in an office, retail, or food service environment) there is no reason to believe that the individual's diabetes will put employees or the public at risk. In other types of employment (such as jobs where the individual must carry a firearm or operate dangerous machinery) the safety concern is whether the employee will become suddenly disoriented or incapacitated. Such episodes, which are usually due to severely low blood glucose (hypoglycemia), occur only in people receiving certain treatments such as insulin or secretagogues such as sulfonylureas and even then occur infrequently. Workplace accommodations can be made that are minimal yet effective in helping the individual to manage his or her diabetes on the job and avoid severe hypoglycemia.

### Hypoglycemia

Hypoglycemia is defined as a blood glucose level <70 mg/dL (4,6). It is a potential side effect of some diabetes treatments, including insulin and sulfonlyureas. It can usually be effectively self-treated by ingestion of glucose (carbohydrate) and is not often associated with loss of consciousness or a seizure. Severe hypoglycemia, requiring the assistance of another person, is a medical emergency.

Symptoms of severe hypoglycemia may include confusion or, rarely, seizure or loss of consciousness (6). Most individuals with diabetes never experience an episode of severe hypoglycemia because either they are not on medication that causes it or they recognize the early warning signs and can quickly self-treat the problem by drinking or eating. Also, with self-monitoring of blood glucose levels, most people with diabetes can manage their condition in such a manner that there is minimal risk of incapacitation from hypoglycemia because mildly low glucose levels can be easily detected and treated (4,7).

A single episode of severe hypoglycemia should not per se disqualify an individual from employment. Rather, an appropriate evaluation should be undertaken by a health care professional with expertise in diabetes to determine the cause of the low blood glucose, the circumstances of the episode, whether it was an isolated incident, whether adjustment to the insulin regimen may mitigate this risk, and the likelihood of such an episode happening again. Some episodes of severe hypoglycemia can be explained and corrected with the assistance of a diabetes health care professional.

However, recurrent episodes of severe hypoglycemia may indicate that an individual may in fact not be able to safely perform a job, particularly jobs or tasks involving significant risk of harm to employees or the public, especially when these episodes cannot be explained. The person's medical history and details of any history of severe hypoglycemia should be examined closely to determine whether it is likely that such episodes will recur on the job. In all cases, job duties should be carefully examined to determine whether there are ways to minimize the risk of severe hypoglycemia (such as adjustment of the insulin regimen or providing additional breaks to check blood glucose levels).

## Hyperglycemia

In contrast to hypoglycemia, high blood glucose levels (hyperglycemia) can cause long-term complications over years or decades but does not normally lead to any adverse effect on job performance. The symptoms of hyperglycemia generally develop over hours or days and do not occur suddenly. Therefore, hyperglycemia does not pose an immediate risk of sudden incapacitation. While over years or decades, high blood glucose may cause long-term

complications to the nerves (neuropathy), eyes (retinopathy), kidneys (nephropathy), or heart, not all individuals with diabetes develop these long-term complications. Such complications become relevant in employment decisions only when they are established and interfere with the performance of the actual job being considered. Evaluations should not be based on speculation as to what might occur in the future. Job evaluations should take high blood glucose levels into account only if they have already caused long-term complications such as visual impairment that interfere with performance of the specific job.

## Aspects of a safety assessment

When an individual with diabetes is assessed for safety risk there are several aspects that must be considered.

**Blood glucose test results.** A single blood glucose test result only gives information about an individual's blood glucose level at one particular point in time. Because blood glucose levels fluctuate throughout the day (this is also true for people without diabetes), one test result is of no use in assessing the overall health of a person with diabetes. The results of a series of self-monitored blood glucose measurements over a period of time, however, can give valuable information about an individual's diabetes health. Blood glucose records should be assessed by a health care professional with expertise in diabetes (7).

**History of severe hypoglycemia.** Often, a key factor in assessing employment safety and risk is documentation of incidents of severe hypoglycemia. An individual who has managed his or her diabetes over an extended period of time without experiencing severe hypoglycemia is unlikely to experience this condition in the future. Conversely, multiple incidents of severe hypoglycemia may in some situations be disqualifying for high-risk occupations. However, the circumstances of each incident should be examined, as some incidents can be explained due to changes in insulin dosage, illness, or other factors and thus will be unlikely to recur or have already been addressed by the individual through changes to his or her diabetes treatment regimen or education.

**Hypoglycemia unawareness.** Some individuals over time lose the ability to recognize the early warning signs of hypoglycemia. These individuals are at increased risk for a sudden episode of severe hypoglycemia. Some of these individuals may

be able to lessen this risk with careful changes to their diabetes management regimen (for example, more frequent blood glucose testing or frequent meals).

**Presence of diabetes-related complications.** Chronic complications that may result from long-term diabetes involve the blood vessels and nerves. These complications may involve nerve (neuropathy), eye (retinopathy), kidney (nephropathy), and heart disease. In turn, these problems can lead to amputation, blindness or other vision problems, including vision loss, kidney failure, stroke, or heart attack. As these complications could potentially affect job performance and safety, such complications should be evaluated by a specialist in the specific area related to the complication. If complications are not present, their possible future development should not be addressed, both because of laws prohibiting such consideration and because with medical monitoring and therapies, long-term complications can now often be avoided or delayed. Thus, many people with diabetes never develop any of these complications, and those that do generally develop them over a period of years.

## Inappropriate assessments

The following tools and terms do not accurately reflect the current state of diabetes treatment and should be avoided in an assessment of whether an individual with diabetes is able to safely and effectively perform a particular job.

**Urine glucose tests.** Urine glucose results are no longer considered to be an appropriate and accurate methodology for assessing diabetes control (8). Before the mid-1970s, urine glucose tests were the best available method of monitoring blood glucose levels. However, the urine test is not a reliable or accurate indicator of blood glucose levels and is a poor measure of the individual's current health status. Blood glucose monitoring is a more accurate and timely means to measure glycemic control. Urine glucose tests should never be used to evaluate the employability of a person with diabetes.

**A1C and estimated average glucose.** Hemoglobin A1C (A1C) test results reflect average glycemia over several months and correlate with mean plasma glucose levels (4). Estimated average glucose (eAG) is directly related to A1C and also provides an individual with an estimate of average blood glucose over a period of time, but it uses the same values and units that are observed when using a

glucose meter or recording a fasting glucose value on a lab report (5). A1C/eAG values provide health care providers with important information about the effectiveness of an individual's treatment regimen (4) but are often misused in assessing whether an individual can safely perform a job. Because they identify only averages and not whether the person had severe extreme blood glucose readings, A1C/eAG results are of no value in predicting short-term complications of diabetes and thus have no use in evaluating individuals in employment situations.

The American Diabetes Association recommends that in most patients A1C levels be kept below 7% (4), or eAG below 154 mg/dL. This recommendation sets a target in order to lessen the chances of long-term complications of high blood glucose levels but does not provide useful information on whether the individual is at significant risk for hypoglycemia or suboptimal job performance and is not a measure of "compliance" with therapy. An A1C or eAG cut off score is not medically justified in employment evaluations and should never be a determinative factor in employment.

**"Uncontrolled" or "brittle" diabetes.** Sometimes an individual's diabetes is described as "uncontrolled," "poorly controlled," or "brittle." These terms are not well defined and are not relevant to job evaluations. As such, giving an opinion on the level of "control" an individual has over diabetes is not the same as assessing whether that individual is qualified to perform a particular job and can do so safely. Such an individual assessment is the only relevant evaluation.

**Recommendations**

- Evaluating the safety risk of employees with diabetes includes determining whether the concerns are reasonable in light of the job duties the individual must perform. (E)
- Most people with diabetes can manage their condition in such a manner that there is no or minimal risk of incapacitation from hypoglycemia at work. A single episode of severe hypoglycemia should not per se disqualify an individual from employment, but an individual with recurrent episodes of severe hypoglycemia may be unable to safely perform certain jobs, especially when those episodes cannot be explained. (E)
- Hyperglycemia does not pose an immediate risk of sudden incapacitation on the job, and long-term complications

are relevant in employment decisions only when they are established and interfere with the performance of the actual job being considered. (E)
- Proper safety assessments should include review of blood glucose test results, history of severe hypoglycemia, presence of hypoglycemia unawareness, and presence of diabetes-related complications and should not include urine glucose or A1C/eAG tests or be based on a general assessment of level of control. (E)

## III. ACCOMMODATING EMPLOYEES WITH DIABETES—Individuals with diabetes

may need certain changes or accommodations on the job in order to perform their work responsibilities effectively and safely. Federal and state laws require the provision of "reasonable accommodations" to help an employee with diabetes to perform the essential functions of the job (3). Additional laws provide for leave for an employee to deal with his or her medical needs or those of a family member (9). Although there are some typical accommodations that many people with diabetes use, the need for accommodations must be assessed on an individualized basis (2).

### Accommodating daily diabetes management needs

Many of the accommodations that employees with diabetes need on a day-to-day basis are those that allow them to manage their diabetes in the workplace as they would elsewhere. They are usually simple accommodations, can be provided without any cost to the employer, and should cause little or no disruption in the workplace. Most employers are required to provide accommodations unless those accommodations would create an undue burden (3). Some accommodations that may be needed include the following.

**Testing blood glucose.** Breaks may be needed to allow an individual to test blood glucose levels when needed. Such checks only take minutes to complete. Some individuals use continuous glucose monitors but will still need an opportunity to check blood glucose with a meter. Blood glucose can be checked wherever the employee is without putting other employees at risk, and employers should not limit where employees with diabetes are permitted to manage their diabetes. Some employees may prefer to have a private location for testing or other diabetes

care tasks that should be provided whenever feasible.

**Administering insulin.** Employees may need short breaks during the workday to administer insulin when it is needed. Insulin can be safely administered wherever the employee happens to be. The employee may also need a place to store insulin and other supplies if work conditions (such as extreme temperatures) prevent the supplies from being carried on the person (10).

**Food and drink.** Employees may need access to food and/or beverages during the workday. This is particularly important in the event that the employee needs to quickly respond to low blood glucose levels or maintain hydration if glucose levels are high. Employees should be permitted to consume food or beverages as needed at their desk or work station (except in an extremely rare situation in which this would pose a hazard and create a safety issue, and if this is the case, an alternative site should be provided).

**Leave.** Employees may need leave or a flexible work schedule to accommodate medical appointments or other diabetes care needs. Occasionally, employees may need to miss work due to unanticipated events (severe hypoglycemic episode) or illness.

**Work schedules.** Certain types of work schedules, such as rotating or split shifts, can make it especially difficult for some individuals to manage diabetes effectively.

### Accommodating complications of diabetes

In addition to accommodating the day-to-day management of diabetes in the workplace, for some individuals it is also necessary to seek modifications for long-term diabetes-related complications. Such people can remain productive employees if appropriate accommodations are implemented.

For example, an employee with diabetic retinopathy or other vision impairments may benefit from using a big screen computer or other visual aids, while an employee with nerve pain may benefit from reduced walking distances or having the ability to sit down on the job. Individuals with kidney problems may need to have flexibility to take time off work for dialysis treatment.

It is impossible to provide an exhaustive list of potential accommodations. The key message in accommodating an employee with diabetes is to ensure that

accommodations are tailored to the individual and effective in helping the individual perform his or her job. Input from health care professionals who specialize in the particular complication, or from vocational rehabilitation specialists or organizations, may help identify appropriate accommodations.

**Recommendations**

- Individuals with diabetes may need accommodations on the job in order to perform their work responsibilities effectively and safely; these include accommodating daily diabetes needs and, when present, the complications of diabetes. All such accommodations must be tailored to the individual and effective in helping the individual perform his or her job. (E)

**CONCLUSION**—Individuals with diabetes can and do serve as highly productive members of the workforce. While not every individual with diabetes will be qualified for, nor can perform, every available job, reasonable accommodations can readily be made that allow the vast majority of people with diabetes to effectively perform the vast majority of

jobs. The therapies for, and effects of, diabetes vary greatly from person to person, so employers must consider each person's capacities and needs on an individual basis. People with diabetes should always be evaluated individually with the assistance of experienced diabetes health care professionals. The requirements of the specific job and the individual's ability to perform that job, with or without reasonable accommodations, always need to be considered.

**Acknowledgments**—The American Diabetes Association thanks the members of the volunteer writing group for this updated statement: John E. Anderson, MD; Michael A. Greene, JD; John W. Griffin, Jr., JD; Daniel B. Kohrman, JD; Daniel Lorber, MD, FACP, CDE; Christopher D. Saudek, MD; Desmond Schatz, MD; and Linda Siminerio, RN, PhD, CDE.

**References**

1. Centers for Disease Control and Prevention: *National Diabetes Fact Sheet: General Information and National Estimates on Diabetes and Prediabetes in the U.S., 2011.* Atlanta, GA, U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, 2011
2. Equal Employment Opportunity Commission: Questions and Answers About Diabetes in the Workplace and the Americans with Disabilities Act (ADA), Oct. 29, 2003. Available from http://www.eeoc.gov/facts/diabetes.html. Accessed 26 May 2008
3. Americans with Disabilities Act of 1990, 42 U.S.C. §12101 et seq.
4. American Diabetes Association: Standards of medical care in diabetes—2013 (Position Statement). *Diabetes Care* 2013;36 (Suppl. 1): S11–S66
5. Nathan DM, Kuenen J, Borg R, Zheng H, Schoenfeld D, Heine R: Translating the A1C assay into estimated average glucose values. *Diabetes Care* 31: 1473–1478, 2008
6. American Diabetes Association: Defining and reporting hypoglycemia in diabetes, a report from the American Diabetes Association Workgroup on Hypoglycemia. *Diabetes Care* 28: 1245–1249, 2005
7. American Diabetes Association: Self-monitoring of blood glucose (Consensus Statement). *Diabetes Care* 17: 81–86, 1994
8. American Diabetes Association: Tests of glycemia in diabetes (Position Statement). *Diabetes Care* 27 (Suppl. 1): S91–S93, 2004
9. Family Medical Leave Act of 1993, 29 U.S.C. §2601 et seq.
10. American Diabetes Association: Insulin administration (Position Statement). *Diabetes Care* 27 (Suppl. 1): S106–S109, 2004

CERTIFICATE OF SERVICE

I certify that on this ___4th___ day of November, 2013, I filed

the foregoing PLAINTIFF'S BRIEF IN OPPOSITION TO MOTION OF

DEFENDANTS FOR SUMMARY JUDGMENT with the Clerk of Court using the

CM/ECF system. The foregoing document was also served on the

following attorney through the CM/ECF system's automatic email

notification of such filing:


    Myra K. Creighton, Esquire
    Fisher & Phillips, LLP
    1075 Peachtree Street NE, Suite 3500
    Atlanta, GA   30309


    _____
    Dennis J. Shatto, Esquire