IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ALEX BENDER,** | : | **No. 1:12-CV-01198** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **NORFOLK SOUTHERN** | : | |
| **CORPORATION, and NORFOLK** | : | |
| **SOUTHERN RAILWAY COMPANY,** | : | **SYLVIA H. RAMBO** |
| **Defendants** | : | |
| | : | |

**M E M O R A N D U M**

In this civil action, Plaintiff asserts claims for discrimination and failure
to accommodate in violation of the Americans with Disabilities Act, 42 U.S.C.
§ 12101 ("ADA"), based on Defendant medically disqualifying him from the
position of railroad conductor due to his Type I insulin dependent diabetes.
Presently before the court are two motions, both of which were filed by Defendant.
(Docs. 24 and 35.)  The first motion, Defendant's motion for summary judgment
(Doc. 24), seeks judgment as a matter of law on the basis that Plaintiff's lack of
control and stability over his diabetes rendered him unqualified to perform the
essential functions of the conductor position in a safe manner.  The second motion,
Defendant's motion to strike (Doc. 35), seeks to exclude an exhibit and certain
portions of a declaration offered by Plaintiff in opposition to the motion for summary
judgment.  For the following reasons, the court will grant in part and deny in part
Defendant's motion to strike, and will deny Defendant's motion for summary
judgment in its entirety.

# I.      Procedural Background

Plaintiff Alex Bender ("Plaintiff") initiated this action by filing a complaint on June 22, 2012 (Doc. 1), and an amended complaint on October 31, 2012 (Doc. 13), alleging that Norfolk Southern Corporation and Norfolk Southern Railway Company (collectively "Defendant") discriminated against him on the basis of his Type I diabetes by rescinding a contingent offer of employment based upon review of Plaintiff's pre-placement physical examination, and further alleging that Defendant refused to grant Plaintiff reasonable accommodation for his disability. Defendant filed its answer to the amended complaint on November 19, 2012. (Doc. 14.) On October 15, 2013, Defendant filed its motion for summary judgment (Doc. 24) and brief in support (Doc. 26), asserting that Plaintiff's claims of discrimination are precluded by Defendant's affirmative defenses of business necessity and direct threat, and because Plaintiff's proposed accommodation was unreasonable and would place an undue hardship on Defendant and its employees. On October 16, 2013, Defendant filed its statement of material facts and supporting exhibits. (Doc. 28.) On November 4, 2013, Plaintiff filed his opposition to the motion for summary judgment (Doc. 29) and response to Defendant's statement of material facts (Doc. 31). Defendant filed a reply brief on November 26, 2013. (Doc. 34.) On November 27, 2013, Defendant filed a motion to strike (Doc. 35) and brief in support (Doc. 37), which sought to strike from the record two attachments submitted in support of Plaintiff's opposition: an article titled, "Diabetes and Employment" (Doc. 29, pp. 21-27 of 27), and portions of the declaration of Charles Heiney (Doc. 31-2, pp. 2-4 of 5). On December 10, 2013, Plaintiff filed an opposition to the motion to strike (Doc.

42), and Defendant filed a reply on December 23, 2013 (Doc. 47). These matters are fully briefed and ripe for disposition.

## II.      Motion to Strike

### A.      Legal Standard

Defendant's motion to strike challenges the admissibility of certain documents relied upon in Plaintiff's brief in opposition. Defendant contends that the court should not consider these portions of the record when deciding its motion for summary judgment.

Either party may challenge the admissibility of evidence used to support a motion for summary judgment. *See Celotex*, 477 U.S. at 324. Rule 56(c)(2) provides, in pertinent part, that "[a] party may object that the material cited to support or dispute a fact *cannot be presented* in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis supplied). Thus, when the admissibility of evidence is challenged, the party relying on the evidence must demonstrate that such evidence is *capable* of admission at trial before it can be considered by the court on summary judgment. However, this requirement does

> not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. [Rule 56] permits a proper summary judgment motion to be opposed by any materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing . . . [that specific facts show there is a genuine issue for trial].

*Celotex Corp.*, 477 U.S. at 324; *see also Lin v. Rohm & Haas Co.*, 293 F. Supp. 2d 505, 511 (E.D. Pa. 2003). Although evidence may be considered in a *form* which is

inadmissible at trial, the *content* of the evidence must be capable of admission at trial. *See* Fed. R. Civ. P. 56(c)(2). Accordingly, the party offering the evidence must demonstrate that it could satisfy the applicable admissibility requirements at trial before the evidence may be used on summary judgment. *See Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631, 643 (E.D. Pa. 2004).

## B. Discussion

Defendant objects to the admissibility of an article by the American Diabetes Association and certain portions of a declaration cited by Plaintiff in his opposition to Defendant's motion for summary judgment. The court will address each document in turn.

## 1. Article Titled "Diabetes and Employment"

Defendant asserts that the court should strike the article attached to Plaintiff's opposition titled, "Diabetes and Employment" (*see* Doc. 29, pp. 21-27), because it is inadmissible hearsay and because Plaintiff has no means to admit it at trial (Doc. 37, p. 2 of 12). Hearsay is an out of court statement that is offered for the truth of the matter asserted. Fed. R. Evid. 801(c). Such a statement is inadmissible, unless it falls under a recognized exception to the prohibition against hearsay. Fed. R. Evid. 802. Inadmissible hearsay should not be considered during summary judgment. *Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009). However, if the statement is capable of being admissible at trial, despite it currently being in an inadmissible form, the statement may be considered for purposes of deciding a motion for summary judgment. *Howley v. Experian Info. Solutions, Inc.*, 813 F. Supp. 2d 629, 637 (D.N.J. 2011) (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1235 n. 9 (3d Cir. 1993)); *J.F. Freeser,*

4

*Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524 (3d Cir. 1990) (citing *Williams v. Borough of W. Chester*, 891 F.2d 458, 465-66 n. 12 (3d Cir. 1989)).

In order to be considered for summary judgment, the proponent of the alleged hearsay must respond to the hearsay objection by demonstrating that the statement will either be admissible at trial as an exception to hearsay or that the statement is not hearsay. *Bouriez v. Carnegie Mellon Univ.*, Civ. No. 02-CV-2104, 2005 WL 2106582, *5 (W.D. Pa. Aug. 26, 2005) (citing *Burgess v. Allstate Ins. Co.*, 334 F. Supp. 2d 1351 (N.D. Ga. 2003)). This rule requires the proponent to demonstrate that there is more than a "mere possibility that the evidence will be admissible at trial." *Id.* (citing *Henry v. Colonial Banking Co. of Dothan*, 952 F. Supp. 744 (M.D. Ala. 1996)). This may be demonstrated by the proponent showing some likelihood that the declarant will appear and testify at trial. *Howley*, 813 F. Supp. 2d at 637.

In the matter *sub judice*, Plaintiff attempts to use the article to support his claim that Defendant's medical guideline concerning individuals with diabetes is not based on current medical knowledge. (*See* Doc. 29, p. 3.) Specifically, Plaintiff uses the authors' statements to argue that a hemoglobin A1c test ("HgA1C")[1] is not useful in determining whether an individual is a safety risk, and to support his proposition that using a diabetic's level of blood sugar "control," or lack thereof, is not relevant to his or her qualifications to safely perform a particular job. (*Id.*) Plaintiff also cites the article in support of his argument that most diabetics can

---

[1] "HgA1C" testing refers to a blood test that tracks the amount of glucose in blood over a two to three month period. (*See* Caruso Dep. at p. 10.) The test is often used to measure a diabetic's success at controlling blood-glucose over a period of time.

manage their condition in such a manner that there is minimal risk of incapacitation. (*Id*. at p. 9.)

Defendant argues that the information contained in the article is hearsay and that Plaintiff is attempting to use the article to prove the truth of the statements contained therein. (Doc. 37, p. 3 of 12.) In addition, Defendant contends that Plaintiff has no means to make the article admissible should the case go to trial as Plaintiff did not provide an expert witness report by the court's scheduling deadline of January 28, 2013, and Plaintiff's treating physician, Dr. Caruso, is not an expert witness. (*Id*. at p. 4 of 12.)

The court agrees with Defendant and concludes that the article is inadmissible hearsay insofar as Plaintiff purports to use it to prove the truth of the statements contained therein and Plaintiff has no means to make the article admissible at trial. Thus, the court will grant Defendant's motion to strike the article from the record.

## 2. Declaration of Charles Heiney

Defendant's motion to strike also challenges that admissibility of Charles Heiney's testimony contained in the following paragraphs of his declaration:

> Paragraph 7: While there are occasions when a 20-minute uninterrupted meal break is not able to be taken, there is always time for a conductor to eat and drink items brought with him.
>
> Paragraph 11: Conductors working off the extra board do not primarily work nights, weekends and holidays. They are protected by hours-of-service rules.
>
> Paragraph 13: Trains are not traveling under time deadlines. A conductor can consume food or beverages any time he wants.

Paragraph 14: When a train arrives at its destination, there are opportunities to eat.

Paragraph 15: Most days a twenty (20) minute meal break is given between 4 ½ and 6 hours after the shift starts.

Paragraph 16: I cannot remember any occasion when the demands of the conductor's job would not have allowed the conductor to eat a candy bar or drink a can of soda for more than 10 or 15 minutes.

Paragraph 17: Under the safety rules of [NSRC], an accident should never happen even in the event a conductor becomes incapacitated.

Paragraph 20: The conductor's job is not physically demanding or strenuous. Conductors rarely lift a knuckle alone.

Paragraph 21: It is highly unlikely, if not impossible, that a conductor's failure to remain alert for even one second can result in a catastrophe.

Paragraph 22: Occasionally, signals are "dark" or obstructed. In such situations the train is stopped until [instructions] are obtained. If the conductor misses a signal which the engineer also misses, the train is stopped until instructions are obtained.

(Doc. 31-2, pp. 2-4 of 5.)

A declaration submitted in opposition to a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The declaration must contain facts demonstrating a basis for the affiant's claim that his statements are based on his personal knowledge. *See Maldonado v. Ramirez*, 757 F.2d 48, 50-51 (3d Cir. 1985) ("The affidavit must be made 'on personal knowledge,' must set forth 'such facts as would be admissible in evidence' and must 'show affirmatively that the affiant is

competent to testify to the matters stated therein.'"). Declarations that are essentially conclusory and lacking in specific facts have no probative value. *Id*. at 51.

Defendant contends that Heiney is not competent to make the statements contained in Paragraphs 7, 13, 14, 15, and 16 about a conductor's ability to eat on the job as he was never employed as a conductor and attests only that he has worked for Defendant since 1999 as an engineer, that he retired in 2012 after 38 and a half years of railroad work, and that he worked with and observed conductors. (*See* Doc. 37, p.5.) Likewise, Defendant argues that Heiney lacks the personal knowledge to make the statements in Paragraphs 11 and 20 regarding the schedules of conductors working off the extra board and the physical demands of the conductor position because he has never worked as a conductor. (*Id*. pp. 6-7.) Finally, Defendant asserts that Paragraphs 17, 21, and 22 are conclusory in nature and lacking in specific facts, and thus should be stricken. (*Id*. at p. 7.)

Under the standard, Defendant can challenge the admissibility of evidence and Plaintiff can show how it is capable of admission at trial. Here, based on Heiney's extensive employment as an engineer, it is not clear that he would be unable to present lay opinion testimony as to the duties and schedules of conductors who undisputably work closely with engineers. Accordingly, the court is not prepared to strike Paragraphs 7, 11, 13, 14, 15, 16, 20, and 22 of the declaration for their inability to be produced in an admissible form at trial. The court believes Defendant's arguments in this regard more properly attack the weight of the evidence than the admissibility thereof. However, the court will strike Paragraphs 17 and 21 of the declaration because the statements are highly speculative and conclusory in nature, and the declaration offers nothing to show that Heiney is competent to testify

on such matters.   Accordingly, the court will strike Paragraphs 17 and 21 of Heiney's declaration from the record, and the balance of Defendant's motion to strike will be denied.

**IV.**      **Motion for Summary Judgment**

   **A.**   **Legal Standard**

Defendant moves for summary judgment on the basis that the facts of record clearly establish that Plaintiff was unqualified to perform the essential functions of the conductor position, and because Plaintiff's requested accommodation would have presented an undue hardship to Defendant and its employees.

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue as to a material fact is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could find for the nonmoving party.  *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson*, 477 U.S. at 248).  In

determining whether there is a genuine issue of material fact, the court must view the facts and draw all reasonable inferences in favor of the nonmoving party. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004) (citation omitted). In addition, the "court may not make credibility determinations or engage in any weighing of the evidence." *Anderson*, 477 U.S. at 255.

The initial burden is on the moving party to show an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citations omitted). The moving party may meet this burden by "pointing out to the district court [] that there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." *Id*. at 325. In order to avoid summary judgment, the nonmoving party may not rest on the unsubstantiated allegations contained in his or her pleadings, but is required by Rule 56 to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Id*. at 324. Summary judgment should be granted where the party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

With respect to the sufficiency of the evidence provided by the nonmoving party, the court should grant summary judgment where the party's evidence is merely colorable, conclusory or speculative. *Anderson*, 477 U.S. at 249-50. That is, there must be more than a scintilla of evidence supporting the nonmoving party's claims and more than some metaphysical doubt as to the material

facts.  *Id*. at 252; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).

### B.    Factual Background[2]

The underlying dispute in this case is revolves around Defendant's employment policies related to diabetics and the risks associated with performance of the full range of a conductor's duties, many of which are safety-sensitive, by an individual diagnosed with Type I insulin dependent diabetes.  More specifically, the dispute concerns the rescission of Plaintiff's job offer and the manner in which Defendant made its assessment of Plaintiff's condition and the safety risks his condition would pose to him, fellow railroad employees, and the public in the event he experienced a hypoglycemic episode or other adverse effect from his diabetes while on the job.  Against this background, the court will summarize the facts pertinent to the instant matter as follows.

Defendant is a Class I railroad company engaged in freight transportation.  (Stinson Decl., ¶ 2.)  In 2010, Defendant posted a job opening on its website for the position of conductor trainee based out of Defendant's Harrisburg

---

[2] In considering the instant motion, the court relied on the uncontested facts or, if the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to Plaintiff as nonmoving party. *See Doe v. C.A.R.S. Prot. Plus*, 527 F.3d 358, 362 (3d Cir. 2008) (stating that on motion for summary judgment, evidentiary materials of record must be viewed in the light most favorable to the nonmoving party).  While Plaintiff denied many of Defendant's statements of material fact, Plaintiff's proffered "facts" in support of his denials, or disputed designations, lack support and/or appropriate citations to the record.  According to Local Rule 56.1,"a statement of material facts in support of, or in opposition to, a [motion for summary judgment] *shall* include references to the parts of the record that support the statements."  L.R. 56.1 (emphasis added). As Plaintiff frequently fails to follow Local Rule 56.1 in his response, his unsupported denials will be deemed insufficient and taken as admitted for purposes of the instant motion. *See* L.R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the moving party.").  Nevertheless, many of the pertinent facts in this matter are undisputed.

Consolidated Terminal located within the Middle District of Pennsylvania. (MacKay Dep. at pp. 10-11, 15-16, Ex. A.) Conductors work closely with locomotive engineers as members of a two or three person train crew charged with the safe and efficient movement of freight. (Stinson Decl., ¶ 8; Cox Decl., ¶ 8; Doc. 28-3, p. 117.) The physical duties of a conductor require lifting up to eighty pounds; assembling railcars to form a train; uncoupling cars from an assembled train; moving or throwing track switches to align track sections; applying and releasing hand brakes on train cars; and participating in shove moves, which may require the conductor to ride the side ladder of a railcar for as far as two miles while moving at speeds up to twenty miles per hour. (Doc. 28-3, p. 117; Stinson Decl., ¶¶ 9-13; Cox Decl., ¶ 9; Prible Decl., ¶ 17.) In addition, a conductor must recognize and interpret railroad signals and accurately judge distances between stationary and moving train cars. (Doc. 28-3, p. 117; Stinson Decl., ¶ 8; Cox Decl., ¶ 8.) The terms and conditions a conductor's employment are governed by a collective bargaining agreement, resulting in conductors with the lowest seniority having little control over their schedule. (Stinson Decl. ¶¶ 17-18; Cox Decl., ¶ 5.) Consequently, conductors lacking in seniority frequently work nights, weekends, and holidays, and often have shifts lasting up to twelve hours. (Stinson Decl., ¶ 19.) In addition, the conductor position is designated as a "safety sensitive" position and is subject to the rules of the Hours of Service Act, 49 U.S.C. § 20101, and the Federal Railroad Administration's Drug Testing Program. (Stinson Decl., ¶ 7; *see* Prible Decl., ¶¶ 10, 14.)

Due to the nature and demands of its safety sensitive positions, Defendant developed medical guidelines concerning a number of medical conditions, including diabetes, that could impact the safety of its employees and the public.

(Prible Decl., ¶ 14.)  These guidelines require applicants for safety sensitive positions to undergo post-offer pre-employment medical evaluations to determine their fitness for duty.  (Prible Decl., ¶ 4.)  If an examination reveals that an applicant has a medical condition that could impact his or her fitness for duty, the medical department may pursue a further individualized inquiry into the applicant's particular situation.  (Prible Decl., ¶ 5.)

According to Defendant, in the event that an applicant for a safety-sensitive position has diabetes, Defendant requires the applicant's diabetes to be "under good control and stable," in order to qualify him or her for the position. (Prible Decl., ¶ 6.)  This medical guideline is due to the potential for diabetes to adversely affect the individual's vision and concentration and cause hypoglycemic episodes, potentially resulting in incapacitation through disorientation, dizziness, confusion, loss of consciousness, and other symptoms.  (*Id*.)  Although Defendant's medical department reviews all applicants on a case-by-case basis, it applies its guidelines uniformly and, in doing so, prefers that the applicant has an HgA1C level of less than 9 and blood sugar levels consistently below 200, thereby reflecting that the applicant's diabetes is well controlled and that he or she is not experiencing regular hypoglycemic episodes.  (Prible Decl., ¶¶ 7-8.)  If the medical department determines that the applicant's diabetes is not well controlled and stable, the department will consult with the applicant's treating physician to get his or her opinion as to whether the applicant can safely perform the essential functions of the safety sensitive position, with or without reasonable accommodation, before making its final fitness for duty determination.  (*See* Prible Decl., ¶ 10.)

Pursuant to Defendant's job posting for conductors at its Harrisburg Terminal, Plaintiff, a Type I insulin dependent diabetic who was diagnosed at the age of thirteen, applied for the conductor position and subsequently received a conditional job offer, contingent upon his passing Defendant's post-offer pre-employment medical evaluation and criminal background check. (Bender Dep. at pp, 39-40, 43; MacKay Dep. at pp. 18-19.) The results of Plaintiff's medical examination revealed the presence of glucose, blood, and protein in his urine. (Prible Dep. at pp. 20-21; Bender Dep. at p. 44.) Upon receiving these results, Defendant's medical department advised Plaintiff that they needed additional medical information to assess the impact of Plaintiff's condition on his ability to perform the essential duties of a conductor. (Caruso Dep. at Ex. 1, pp. 115-16.) Specifically, the medical department requested a written statement from Plaintiff's treating physician indicating the current status of his diabetes and whether the physician recommended any work restrictions and/or necessary accommodations, and provided a copy of the conductor job description for his physician to review. (*Id.*) In addition, the medical department asked Plaintiff to provide a daily monitoring log of his glucose levels. (*Id.*)

In a letter dated November 16, 2010, Plaintiff's physician, Dr. Kelly S. Caruso, advised the medical department that Plaintiff's blood sugars were well controlled and that his condition was stable on an insulin pump. (Caruso Dep. at p. 118 of 123.) Dr. Caruso added that Plaintiff had infrequent hypoglycemic episodes that he is able to successfully treat with glucose supplementation. (*Id.*) She described Plaintiff as "compliant with all treatments," and noted that he "has a very good understanding of his disease state and is very capable of compensating for both

14

low and high blood sugars." (*Id.*) Finally, Dr. Caruso approved Plaintiff for the position, stating that he "is very capable of performing the essential functions of [the] job provided he is able to eat regularly scheduled meals and has access to glucose tablets to take as needed for infrequent hypoglycemic episodes." (*Id.*) However, on November 18, 2010 – two days after sending her letter to Defendant's medical department – Dr. Caruso entered a notation in Plaintiff's medical record in which she described Plaintiff's blood sugars as "not well controlled with [HgA1C] at 9.3." (*Id.* at p. 106 of 123.)

Defendant sought clarification of the frequency of Plaintiff's hypoglycemic episodes and the phrase, "regular meals." (*Id.* at p. 122 of 123.) Dr. Caruso responded that Plaintiff experienced hypoglycemic episodes approximately one to two times per month at night and would "need to eat breakfast, lunch and dinner daily as well as have access to glucose supplementation as needed if he experiences hypoglycemia." (*Id.*) She added that Plaintiff's meals would "need to occur [at] regularly scheduled times [each day]." (*Id.*)

On November 23, 2010, Dr. C. Ray Prible,[3] Director of Medical Services for Defendant, reviewed Plaintiff's medical file to assess Plaintiff's fitness for duty. (Prible Dep. at pp. 21-23; Prible Decl., ¶ 11.) Dr. Prible reviewed Plaintiff's medical file, including the documentation Plaintiff's post-offer pre-employment medical examination, Plaintiff's medical records, Plaintiff's glucose monitoring log, and Dr. Caruso's letters. (Prible Dep. at pp. 12-14, 23-26, 30; Prible Decl., ¶ 11.) As a result of his review and pursuant to Defendant's medical

---

[3] Dr. Prible is board certified in Internal Medicine and has practiced occupational medicine for over thirty years. He has been employed with Defendant for more than nineteen years. (Prible Dep. at p. 7.)

standards, Dr. Prible determined that Plaintiff was not medically qualified to perform the essential functions of the conductor position because Plaintiff did not have good control or stability of his diabetes.  In addition, Dr. Prible found that Defendant could not accommodate Dr. Caruso's stipulation that Plaintiff eat three regularly scheduled meals each day.  (Prible Dep. at pp. 33-34; Prible Decl. at ¶ 12.)

In concluding that Plaintiff did not have good control of his diabetes, Dr. Prible was particularly concerned with Plaintiff's HgA1C level of 9.3 and several notations in Plaintiff's glucose log, revealing that Plaintiff had sugar levels over 200 as well as one level in the 40s.  (Prible Dep. at pp. 33-34.)  In addition, Dr. Prible opined that the symptoms Plaintiff experienced during a hypoglycemic episode, including tachycardia and anxiety, would have distracted Plaintiff from his duties while he focused on taking a glucose supplementation tablet, even if he could quickly access such supplementation.  (Prible Dep. at pp. 32-33;Prible Decl., ¶¶ 12-13.)  However, Dr. Prible acknowledged in his deposition that Defendant employs Type I diabetics who carry glucose supplementation tablets with them on the job. (Prible Dep. at pp. 32-33.)

Dr. Prible determined that Defendant could not accommodate Dr. Caruso's requirement that Plaintiff eat three regularly scheduled meals per day, because conductor trainees, as least-senior, work erratic and unpredictable schedules with no guarantee of a set break for a meal.  (Prible Dep. at pp. 31-34, 40-43; Prible Decl. ¶ 12.)  However, Dr. Prible subsequently testified that requiring a Type I diabetic to eat three regularly scheduled meals each day is "fairly typical standard advice."  (Prible Dep. at p. 41.)

As a result of Dr. Prible's recommendation that Plaintiff was not medically qualified for the conductor position, Defendant sent Plaintiff a letter advising him that he was medically disqualified from the position and inviting him to apply for other positions.[4] (Mackay Dep. pp. 13-14.)

### C. Discussion

Rather than challenging Plaintiff's ability to establish a prima facie case of discrimination, Defendant argues that Plaintiff's claims are barred by its defense that the qualification standard it relied upon in rescinding Plaintiff's job offer was a business necessity due to safety considerations, or, alternatively, by its defense that Plaintiff posed a direct threat to the safety of himself, other employees, and the public. Defendant has the burden of proving these defenses. Thus, with regard to Defendant's motion, Plaintiff need only show that a genuine issue of material fact is in dispute or that Defendant has not substantiated an essential element of its affirmative defenses.

### 1. Discrimination Claims

Defendant argues that Plaintiff posed an unacceptably high risk of injury to himself, other employees and the public due to his lack of control and stability over his Type I insulin dependent diabetes, and therefore he is not otherwise qualified to perform the essential safety-sensitive duties of a conductor. Asserting that there are no reasonable accommodations available that would render Plaintiff capable of performing the essential functions of the position in a safe manner, Defendant contends that it is entitled to judgment as a matter of law on Plaintiff's

---

[4] Although both parties cite to the letter in their briefs, the letter is not before the court as an exhibit.

discrimination claims on the basis of the business necessity and direct threat defenses.

Plaintiff counters that Defendant rescinded his job offer because of his Type I insulin dependent diabetes based upon an impermissible blanket application of its medical guideline, which purportedly prohibits employment of individuals with uncontrolled or unstable diabetes in safety-sensitive positions. The medical guideline was, at least in part, developed by Dr. Prible, who, Plaintiff claims, applied this blanket policy to Plaintiff without making a proper individualized determination of Plaintiff's actual condition and the effects his diabetes had on his ability to perform the essential safety-sensitive functions of the conductor position, and without adequate deference to the opinion of Plaintiff's treating physician, Dr. Caruso, who had authorized him for the position with the restriction that he eats three regularly scheduled meals each day.

### a.    Business Necessity Defense

Defendant's medical guideline pertaining to individuals with diabetes constitutes a qualification standard, as it is a medical requirement which must be satisfied to work in a safety-sensitive position, such as that of conductor. It is undisputed that Defendant medically disqualified Plaintiff from the conductor position due to his failure to meet the requirements of its qualification standard, and Defendant does not challenge Plaintiff's prima facie case of discrimination. Accordingly, the court's preliminary analysis as to Plaintiff's discrimination claims begins with Defendant's affirmative defense of business necessity.

Defendant contends that its medical guideline qualifies as a business necessity under the ADA, which bars Plaintiff's recovery, because the guideline is

both job-related and justified by business necessity.  In response, Plaintiff asserts that it is difficult to discern the content of the guideline as it is not part of the record and, while Defendant represents that the guideline requires "good control and stability" of diabetes, Defendant also states that it prefers a diabetic's tests fall within certain criteria, *e.g.*, blood sugar levels consistently below 200.  (Doc. 29, pp. 6-7 of 27.) Either way, Plaintiff contends that the medical guideline is an improper blanket exclusion on diabetics that does not meet the ADA's requirement for an individualized assessment, and therefore is invalid.  (Doc. 29, pp. 7-9 of 27.)

The ADA prohibits an employer from applying a qualification standard "that screen[s] out or tend[s] to screen out an individual with a disability or a class of individuals with disabilities."  42 U.S.C. § 12112(b)(6).  However, the law also affords an employer an affirmative business necessity defense to claims challenging the application of an otherwise problematic standard.  *Verzeni v. Potter*, 109 F. App'x 485, 490 (3d Cir. 2004); *Allmond v. Akal Sec., Inc.*, 558 F.3d 1312, 1316 (11th Cir. 2009); *see* 42 U.S.C. § 12113(a).  The parties rely on these competing provisions here: Plaintiff claims that Defendant's medical guideline precludes individuals with diabetes from employment in safety-sensitive positions, and Defendant contends that the medical guideline is a lawful business necessity.

To benefit from the affirmative defense, an employer must prove that the pertinent qualification standard is job-related for the position in question and is consistent with business necessity, and cannot be met by a person with the plaintiff's disability even with a reasonable accommodation.  *Verzeni*, 109 F. App'x at 490; *Allmond*, 558 F.3d at 1317-18 (citing 42 U.S.C. § 12113(a)); *Chevron U.S.A. Inc., v. Echazabal*, 536 U.S. 73, 78 (2002) (explaining that 42 U.S.C. §§ 12112(b)(6) and

19

12113 create an affirmative defense for standards shown to be job-related for the position in question and consistent with business necessity); *Rohr v. Salt River Project Agric. Imp. And Power Dist.*, 555 F.3d 850, 862 (9th Cir. 2009) ("Once an employee shows that a qualification standard tends to screen out an individual with a disability, the employer shoulders the burden of proving that the challenged standard is job-related and consistent with business necessity."); *Atkins v. Salazar*, 677 F.3d 667, 681-82 (5th Cir. 2011) (requiring the employer to prove by a preponderance of the evidence that such standards are "(1) uniformly applied; (2) job-related for the position in question; (3) consistent with business necessity; and (4) cannot be met by a person with plaintiff's disability even with a reasonable accommodation"). The employer's burden in proving that its qualification standard satisfies the business necessity defense "is quite high, and is not to be confused with mere expediency." *Indergard v. Georgia-Pacific Corp.*, 582 F.3d 1049, 1057 (9th Cir. 2009). Once the employer demonstrates that the qualification standard at issue is job-related and consistent with business necessity, the burden shifts to the plaintiff to offer a reasonable accommodation that would allow him to satisfy that standard. *Allmond*, 558 F.3d at 1317 (citing *Moses v. Am. Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996) ("The employee retains at all times the burden of persuading the jury . . . that reasonable accommodations were available.")).

To show that a qualification is job related, "the employer must demonstrate that the qualification standard is necessary and related to the 'specific skills and physical requirements of the sought-after position.'" *Atkins*, 677 F.3d at 682; *see Allmond*, 558 F.3d at 1317 (noting that job-relatedness "is used in analyzing the questions or subject matter contained in a test or criteria used by an employer in

making hiring or promotional decisions"). To show that the qualification is a business necessity, the employer must demonstrate that a business reason makes necessary the use of a test or criteria in hiring or promotional decision making. *See Atkins*, 677 F.3d at 682; *see also Allmond,* 558 F.3d at 1317.

In assessing whether a safety-based qualification standard meets the business necessity defense, the Third Circuit has instructed that the factfinder must determine whether the qualification is reasonable. *Verzeni*, 109 F. App'x at 493. To be reasonable, it must be "well informed in the light of current objective medical knowledge considering the medically accurate nature of the risk, the duration of the risk, the severity of the risk, and the probabilities that the disability will cause harm." *Id.*; *see School Board of Nassau Cnty. v. Arline*, 480 U.S. 273, 279 (1987) (establishing this four factor analysis in the context of the direct threat defense). In evaluating these factors, the court should take into account that the "acceptable probability of an incident will vary with the potential hazard posed by the particular position: a probability that might be tolerable in an ordinary job might be intolerable for a position involving atomic reactors." *Atkins*, 677 F.3d at 682 (quoting *E.E.O.C. v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000). In other words, "the probability of the occurrence is discounted by the magnitude of its consequences." *Id*. However, the qualification must not be based on "unfounded fears," but rather only on "medically accurate facts" about the disability and "on the real risks that the disability may present." *Verzeni*, 109 F. App'x at 491-92. "Even an employer's good faith actions will not save [it] if the employer is misinformed about the realities of the disability." *Id*.

In the matter *sub judice*, Defendant asserts that its medical guideline requiring a diabetic's condition "to be under good control and stable" meets both criteria of the business necessity defense. First, Defendant argues that the guideline is job-related for the conductor position because it is designed to ensure that individuals employed in safety-sensitive positions, such as that of conductor, are physically able to perform the essential duties of the position and that their performance does not constitute a threat to the health and well being of themselves, fellow railroad employees, or the public. (*See* Doc. 26, p. 15 of 34.) A conductor's safety-sensitive duties include controlling track switches, monitoring the train's air pressure and track conditions, communicating railroad signals to other crew members, moving rail cars, and mounting and dismounting equipment. (*Id*. at p. 18 of 34.) In addition, trains for which a conductor is responsible may be one mile in length, weigh up to 200 tons, hit speeds of sixty miles per hour, and transport hazardous or combustible materials through populated areas. (*Id*.) Consequently, a conductor must be able to maintain alertness, concentration, focus, and situational awareness. (*Id*.) Thus, Defendant argues that the medical guideline under which Plaintiff's job offer was rescinded is congruent with Defendant's legitimate concern for ensuring the safety of the public and its employees, focusing on the propensity of uncontrolled diabetes to adversely effect an individual's vision and concentration and cause other complications, such as hypoglycemic episodes. (*See id.* at pp. 15-19 of 34.) Such symptoms of uncontrolled diabetes are impediments to safely performing the work of a conductor, and, therefore, according to Defendant, it is clear that the medical guideline's focus on uncontrolled diabetes was "related to the specific skills and requirements" of being a conductor. (*Id*.)

Next, Defendant asserts that the medical guideline also substantially promoted Defendant's needs consistent with business necessity because it is a safety-based qualification designed to protect the public. (*Id*. at p. 16 of 34 (citing *Atkins*, 677 F.3d at 683).) Defendant elaborates that, even if an individual has never experienced a complication from uncontrolled diabetes, the possibility of its occurrence is always present and inherently dangerous when the individual is employed in a safety-sensitive position (*see id.* at pp. 16-17 of 34), as "even a momentary lapse of attention or distraction . . . may result in serious harm to the [employee], [a] coworker, or the public" (Doc. 26, p. 15 of 26). Consequently, Defendant contends that implementing its medical guideline in an effort to prevent future harm was proper because an employer is not required to wait until after a catastrophe occurs to take action. (Doc. 26 at p. 24 of 26 (citing *Atkins*, 677 F.3d at 683).) Moreover, the conductor position is among the various railroad positions that courts have universally recognized as safety-sensitive, affecting not only the conductor's own safety but also that of his coworkers and the public, (Doc. 26, p. 17 of 34 (citing *Skinner v. Railway Labor Exec. Ass'n*, 489 US. 602, 621 (1989))), and courts routinely grant summary judgment to an employer asserting that a safety-based qualification standard was justified by business necessity when, like here, public safety is implicated (Doc. 26, pp. 10-11 of 34 (citing, *inter alia*, *Atkins*, 677 F.3d 667 and *Allmond*, 558 F.3d at 1318)).

While there is factual support for Defendant's formulation of a safety-based qualification guideline for applicants with uncontrolled Type I insulin dependent diabetes due to the potential risk that such an individual could pose in a safety-sensitive position, Defendant has failed to put forth into evidence the

guideline itself, instead relying on the declaration and deposition testimony of Dr. Prible. Not only does the absence of the guideline create gaps in the court's analysis of Defendant's business necessity defense since such a defense inherently rests on the reasonableness of the guideline itself, it also calls into question the actual content of the guideline. Defendant represents that the "guideline is for an individual's diabetes to be under good control and stable" (Doc. 26, p. 15 of 34), and, consistent with that representation, Dr. Prible states in his declaration that "the medical department evaluates all [applicants] with Type I insulin dependent diabetes for, among other things, control, stability and any complications." (Prible Decl., ¶ 6.) However, Dr. Prible also references additional "guidelines" in his declaration, including Defendant's preference for diabetic applicants to have HgA1C levels below 9 and blood sugar levels consistently below 200. (*Id*. at ¶¶ 7-9.) Although a guideline encompassing each of these requirements may be permissible under the ADA, the guideline's notable absence from the record is troublesome to the court, especially light of Defendant's argument that the guideline is dispositive of its motion. Considering Defendant carries the burden of proving its affirmative defense, the court cannot grant summary judgment with certainty based on a policy that it has been unable to review because it is not in the record.

### 2. Direct Threat Defense

In addition to the business necessity defense, Defendant also asserts a direct threat defense to Plaintiff's claims of discrimination. Both defenses are very similar in nature and "do not present hurdles that comparatively are inevitably higher or lower but rather require different types of proof. *See* E.E.O.C., 203 F.3d at 875. Business necessity focuses on the pertinent qualification standard, assessing whether

it can be justified by an across-the-board requirement for all employees. *Id*. In contrast, direct threat focuses on the individual employee, examining the specific risk posed by his or her disability. *Id*. (citing 29 C.F.R. § 1630.2(r)).

A "direct threat" is defined as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r); 42 U.S.C. § 12111(3). The key inquiry when considering whether an applicant or employee poses a direct threat is "not . . . whether a risk exists, but whether it is significant." *Bragdon v. Abbott*, 524 U.S. 624, 641 (1998). An employer's determination that an applicant or employee poses a direct threat must be based on "a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence and upon an individualized assessment of the individual's present ability to safely perform the essential functions of the position." *Chevron*, 536 U.S. at 86. A court considering the presence of a direct threat must take into account specific characteristics of the harm allegedly posed by the individual with a disability, including: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that potential harm will occur; and (4) the imminence of potential harm. 29 C.F.R. § 1630.2(r); *Arline*, 480 U.S. at 279. The defendant bears the burden of proving that the plaintiff posed a direct threat. *Chevron*, 536 U.S. at 78. In light of these considerations, the court concludes that a genuine issue of triable fact exists as to whether Plaintiff's physical condition presents a significant risk of substantial harm to himself and others.

### a. **Direct Threat Analysis**

First, with respect to the question of the duration of the risk, Defendant submits that the objective evidence shows the risk Plaintiff posed was permanent, and cites to Dr. Caruso's November 19, 2010 letter stating that Plaintiff experienced one to two hypoglycemic episodes each month (Caruso Dep. at p. 122 of 123), and Dr. Caruso's testimony that Plaintiff's diabetes was poorly controlled at best (*Id.* at p. 72 of 123). Plaintiff, on the other hand, contends that he has never had any symptoms of severe hypoglycemia and, while he occasionally experiences mild hypoglycemia at night, he is able to recognize the event and treat it promptly. (*See id.* at p. 118 of 123.) In essence, he argues that the risk is of short duration, if any. (*See* Doc. 29, p. 11 of 27.) Viewing the evidence in the light most favorable to Plaintiff, the court concludes that a reasonable trier of fact could find that the duration of any risk would not be significant.

With respect to the second factor under the direct threat analysis, *i.e.*, the nature and severity of the harm, Defendant argues that, due to the safety-sensitive nature of a conductor's job duties, the severity of potential harm includes bodily injury or death. (Prible Decl., ¶¶ 17-19; Doc. 28-3, p. 117 of 123.) Indeed, as the Supreme Court recognized in upholding drug testing for freight train employees: "Employees subject to the tests discharge duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences." *Skinner*, 489 U.S. at 628. In this regard, Plaintiff agrees that the potential harm could be severe. (Doc. 29, p. 12.) Thus, the second factor is undisputed.

Defendant, however, has not established the third factor in the analysis, the likelihood of the potential harm. Defendant argues that, while the potential harm

26

cannot be determined with mathematical certainty, the risk is real, pointing to Plaintiff's deposition testimony that he has experienced shakiness, increased heart rate, and anxiousness as a result of his diabetes. (*See* Bender Dep. at p. 63.) On the other hand, Plaintiff asserts that he has never experienced confusion, disorientation, unconsciousness, or dizziness during a hypoglycemic episode and that it only takes him one minute or less to treat the event with glucose. (*Id*. at p. 61.) Defendant contends that the shift in focus to obtain glucose could cause an accident even if Plaintiff is able to access the supplementation immediately and if it would quickly eliminate his symptoms. In addition, Dr. Caruso admitted that Plaintiff would not be able to access the glucose if he was holding on to the side of a train. (Caruso Dep. at pp. 46-47.) Drawing all inferences in Plaintiff's favor, the court cannot conclude that a momentary distraction to obtain glucose supplementation or the mild symptoms Plaintiff occasionally experiences as a result of his diabetes rise to the level of a significant risk of harm. In fact, in light of the evidence of record, a reasonable jury could conclude that the likelihood of the harm that Defendant fears is quite low.

For similar reasons, the court finds little evidence to support Defendant's contention that Plaintiff posed an imminent threat of harm. Defendant submits that the risk of harm was imminent based upon Dr. Caruso's written statement that Plaintiff experienced two hypoglycemic episodes each month (Caruso Dep. at p. 122 of 123), and her deposition testimony that an inability to eat on a regular basis combined with physical exertion increases the risk of a hypoglycemic event. (Caruso Dep. at pp. 14-15.) This evidence, without more, is insufficient to meet Defendant's burden at this stage. Given the relatively mild symptoms Plaintiff

experiences when he has a hypoglycemic episode and his ability to control such episodes (Bender Dep. pp. 61-63), the evidence does not suggest that the risk of injury was sufficiently likely to occur. Consequently, a reasonable jury could conclude that the imminence of potential harm was insignificant.

### b.    Individual Assessment

In opposing Defendant's direct threat defense, Plaintiff also argues that an issue of fact exists about whether Defendant conducted a sufficiently individualized assessment of Plaintiff's diabetic condition and his ability to perform the essential functions of the conductor position that was supported by objective, medical evidence, or whether its assessment was based on stereotypes and insufficient data, and relied too heavily on its medical guidelines. Plaintiff argues that, had Defendant engaged in the proper assessment, it would have determined that Plaintiff could safely perform the essential functions of the position. Defendant argues that Dr. Prible completed his due diligence in making his recommendation based on a comprehensive, individualized assessment of Plaintiff's ability to work in a safety-sensitive environment in accordance with his knowledge of the essential functions of the conductor position and the standard of care.

The rescission of a conditional job offer due to the failure to meet the requirements of Defendant's guidelines must be based on an individualized assessment of the objective evidence that an applicant's impairments affected his ability to safely perform the essential functions of the job. *Chevron*, 536 U.S. at 86. Indeed, it is only through a proper individualized assessment that an employer can show that the applicant would pose a significant risk of substantial harm in the

safety-sensitive position.  A question of fact, however, exists regarding whether a proper individualized assessment was conducted here.

It is clear from the record that Defendant did individualize its inquiry to some extent and did not simply rely upon an absolute "anti-diabetes" rule.  Instead, it had Plaintiff submit to a medical examination and, based on the results of that examination, asked Plaintiff to submit a written statement from Plaintiff's physician indicating the current status of his diabetes and asked Plaintiff to provide a daily monitoring log of his glucose levels.  (Caruso Dep. pp. 115-16.)  In addition, after receiving Dr. Caruso's written statement, Defendant sought clarification of the frequency of Plaintiff's hypoglycemic episodes and Dr. Caruso's use of the phrase, "regular meals."  (*Id.*)  Based on the information it collected during this inquiry, Defendant concluded that Plaintiff was not medically qualified to safely perform the duties of the conductor position.  While these facts do show that Defendant performed an individual inquiry, a question remains as to whether Defendant relied too heavily on certain general standards contained within its medical guidelines, disputably running afoul of the ADA's requirement for individualized assessment, and whether it was required to make a more detailed and individualized inquiry into Plaintiff's individual circumstances, in effect deciding whether it might be safe to permit him to work in a safety-sensitive position given the actual effects the condition had on Plaintiff and his real ability to perform the job.  In this regard, Plaintiff has presented evidence showing that he poses little risk of a hypoglycemic episode or other adverse effects from his diabetes, and has shown that he has never had a severe hypoglycemic episode.  While the law does not require Defendant to put the lives of its employees or the public at risk by taking a chance that Plaintiff will

not experience a hypoglycemic episode on the job, it does require NSRC to make an informed individualized determination about the disability's effects on the particular employee. *See Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 193 (3d Cir. 1999) (finding that it is the employer's burden to educate itself about the varying nature of an impairment and to make an individualized determination about an affected employee); *Britting v. Shineski*, Civ. A. No. 08-1747, 2010 WL 500442, * 6 (M.D. Pa. Feb. 5, 2010) ("When an impairment is the type whose symptoms will vary greatly from person to person, [an employer] must engage in an individualized assessment of the effect of the impairment" in the employee or applicant's own experience) (citing *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 199 (2002)). Thus, the court finds that a reasonable jury could conclude that NSRC failed to perform the kind of individual assessment envisioned by the ADA.

For these reasons, the court concludes that there exists a genuine issue of material fact with regard to Defendant's affirmative defenses. Thus, the court will deny Defendant's motion for summary judgment as to Plaintiff's discrimination claims.

### B.    Failure to Accommodate Claim

In addition to his discrimination claim, Plaintiff asserts a failure to accommodate claim, wherein he alleges that Defendant did not offer or attempt to engage in an interactive process with him to determine how it could accommodate his condition, and refused to grant Plaintiff reasonable accommodations for his disability in violation of the ADA. (Doc. 13, ¶ 24.) More specifically, Plaintiff asserts that Defendant refused to accommodate the restriction Dr. Caruso placed on Plaintiff's employment, *i.e.*, that he eat three regularly scheduled meals each day and

have access to his glucose supplementation tablets. (*See* Caruso Dep., pp. 15, 118 of 123.) Defendant contends that the requested accommodation is not reasonable in the railroad environment and that, even if providing such an accommodation was reasonable, it would not eliminate the risk Plaintiff presented and would impose an undue hardship on Defendant and its employees. (Doc. 26, p. 27 of 34.)

An employer must "mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodations would impose an undue hardship on the operation of the business of the [employer]." *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 614 (3rd Cir. 2006) (citing 42 U.S.C. § 12112(b)(5)(A)). "Reasonable accommodations" include measures such as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, . . . and other similar accommodations for individuals with disabilities." *Id*. (citing 42 U.S.C. § 12111(9)).

The duty to provide reasonable accommodation is subject to certain limitations. For instance, the ADA does not require an employer to create a new position in order to accommodate an employee with a disability, or to transform a temporary light duty position into a permanent position. *Id*. at 614. Relevant here, an employer is not required to provide a reasonable accommodation if it would pose a "direct threat" to the safety of the applicant or others or, if doing so, would conflict with seniority rules. *Id*. (citing 29 C.F.R. § 1630.15(b)(2) and *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002)).

The issue of reasonable accommodation is a question for the trier of fact. *Id*. In deciding whether a genuine issue of material fact exists regarding the

31

reasonableness of the requested accommodation, the court must first examine whether the plaintiff has made a prima facie showing that his proposed accommodation is possible. *Id*. If he has done so, the burden then shifts to the defendant to prove, as an affirmative defense, that the accommodation requested by the plaintiff is unreasonable or would cause undue hardship. *Id*.

Plaintiff has satisfied his initial burden because his proposed accommodation appears practical. Specifically, Dr. Caruso required Plaintiff to eat three meals at regularly scheduled times each day, an accommodation that appears possible. The burden thus shifts to Defendant to demonstrate that the accommodation is unreasonable or would cause undue hardship.

First, Defendant argues that, pursuant to Defendant's seniority rules, Plaintiff's work schedule would be "totally erratic and unpredictable" and often too intense to provide time to eat. (Doc. 26, p. 21.) The record in this regard is not well developed. In light of the basic human necessity to eat, especially in the context of a physically demanding job where safety considerations require its employees to maintain "alertness, concentration, [and] focus" (Doc. 26, p. 12), the court finds Defendant's argument unavailing. The court must assume that Defendant's employees working twelve hour shifts are able to eat, and Plaintiff has presented witness testimony to support this assumption. (*See* Heiney Decl. at ¶¶ 6-7, 15-16.) Whether Defendant could reasonably accommodate Plaintiff's need to eat at regularly scheduled times each day is a question for the trier of fact.

In this regard, the court notes that Defendant's argument assumes that Plaintiff must sit down to a time consuming meal to comply with Dr. Caruso's requirements. (*See* Doc. 26, pp. 27-28.) However, to accommodate Plaintiff,

Defendant need not polish the silver; rather, providing Plaintiff the brief opportunity to consume something to bring his glucose levels to normal would be sufficient. Indeed, to maintain his glucose levels, Dr. Caruso testified that Plaintiff would only need to eat sixty grams of carbohydrates, an amount which can be found in a half a bottle of Mountain Dew or in a Snickers bar. (Caruso Dep., pp. 47-48, 82.) A reasonable jury could conclude that Defendant's refusal to accommodate Dr. Caruso's restriction was unreasonable given that its employees must find time to eat, whether at a table or on the go.

In addition, to the extent Defendant was concerned it could not appropriately accommodate Plaintiff, Defendant had a duty under the ADA to engage in an "interactive process" of communication *with Plaintiff* wherein both parties "assist in the search for appropriate reasonable accommodation and to act in good faith." *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997) (discussing the duty in the context of the Rehabilitation Act); *Williams v. Philadelphia Hous. Auth. Police Dep.*, 380 F.3d 751, 771 (3d Cir. 2004); *see also* 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."). A plaintiff can demonstrate that an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process by showing that: (1) the employer knew of the plaintiff's disability; (2) the plaintiff requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort

to assist the plaintiff in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. *Williams*, 380 F.3d at 772 (quoting *Taylor v. Phoenixville Sch. Dist*., 184 F.3d 296, 319-320).

In the instant matter, it is undisputed that Defendant knew of Plaintiff's disability and Dr. Caruso's restriction on Plaintiff's employment. As discussed above, a reasonable factfinder could conclude that Defendant's decision not to accommodate Plaintiff's need for regularly scheduled meals was not made in good faith and that Plaintiff could have been reasonably accommodated but for Defendant's lack of good faith. Thus, a material dispute of fact exists as to whether Defendant failed to engage in good faith in the interactive process, thereby failing to reasonably accommodate Plaintiff.

In the alternative, Defendant argues that the proposed accommodation nevertheless fails to eliminate the risk presented by Plaintiff's uncontrolled diabetes. As discussed above, a genuine issue of fact exists as to whether Plaintiff's condition did, in fact, pose a risk of harm.

Finally, Defendant contends that the accommodation, even if reasonable, would impose an undue hardship on Defendant's business operations and Plaintiff's coworkers. An undue hardship may result when an accommodation would be disruptive to the business or the ability of other employees' to work. *See Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir. 1995) ("An accommodation that would result in other employees having to work harder or longer hours is not required."). Defendant argues that Plaintiff's meal breaks would result in the work stopping for Plaintiff and his coworkers; otherwise, his coworkers would have to cover his responsibilities or his work would be delayed while he ate. (Doc. 26, p. 29 of 34.)

Defendant has offered little evidence to support this contention (*see* Doc. 26, p. 29 of 34 and Doc. 28, ¶¶ 28-29, 33, 35),  and thus it has not met its burden of proving undue hardship.  Moreover, consuming the carbohydrates necessary to stabilize his glucose levels would take no more time that using the restroom, a type of break for which employees cover.  Thus, there remains a genuine issue of material fact regarding whether the accommodation would place an undue hardship on Defendant's employees.

Accordingly, the court finds that genuine issues of material fact exist as to whether Defendant denied the employment opportunity to Plaintiff based on the need to make reasonable accommodation in accordance with Plaintiff's treating physician's instructions, in violation of the ADA.  *See* 42 U.S.C. § 12112(5)(B).


**V.**　　　　　**Conclusion**

For the foregoing reasons, the court finds that there are genuine issues of material fact remaining as to Plaintiff's discrimination and failure to accommodate claims against Defendant.  Therefore, the court will deny Defendant's motion for summary judgment.

An appropriate order will issue.

　　　　　　　　　　　　　　s/Sylvia H. Rambo
　　　　　　　　　　　　　　United States District Judge
Dated:  January 14, 2014.

35