IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ALEX BENDER,** | : |
| **Plaintiff** | : No. 1:12-CV-01198 |
| v. | : |
| **NORFOLK SOUTHERN CORPORATION, and NORFOLK SOUTHERN RAILWAY COMPANY,** | : |
| | : **SYLVIA H. RAMBO** |
| **Defendants** | : |

# M E M O R A N D U M

In this civil action, Plaintiff asserted claims for discrimination and failure to accommodate, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 ("ADA"), against Defendant for medically disqualifying him from the position of railroad conductor due to his "uncontrolled" Type I insulin-dependent diabetes. Following a three-day jury trial, the jury rendered a verdict in Defendant's favor. Presently before the court is Plaintiff's post-trial motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50, or, in the alternative, a new trial, pursuant to Federal Rule of Civil Procedure 59(b). For the reasons stated below, the court will deny Plaintiff's motion in its entirety.

**I.     Background**

As the parties have already been through a trial on this matter, and the factual background of this case was set forth at length in the court's memorandum denying Defendant's motion for summary judgment (*see Bender v. Norfolk Southern Corp., and Norfolk Southern Railway Co.*, 1:12-cv-01198, 2014 WL 131638, — F.

Supp. 2d — (M.D. Pa. Jan. 14, 2014)), it is unnecessary to recount a lengthy factual and procedural history at this juncture.

### A. **Factual Background**

Briefly stated, Defendant, Norfolk Southern Corporation and Norfolk Southern Railway Company (collectively "Defendant"), is a Class I railroad company engaged in freight transportation. In 2010, Defendant posted a job opening for the position of conductor trainee, a "safety sensitive" position, based out of its Harrisburg Consolidated Terminal located within the Middle District of Pennsylvania. Pursuant to the job posting, Plaintiff, a Type I insulin-dependent diabetic, applied for the conductor position and subsequently received a conditional job offer, contingent upon his passing Defendant's post-offer pre-employment medical evaluation and criminal background check. The results of Plaintiff's medical examination revealed the presence of glucose, blood, and protein in his urine. Upon receiving these results, Defendant's medical department advised Plaintiff that they needed additional information to assess the impact of Plaintiff's medical condition on his ability to perform the essential duties of a conductor. Specifically, the medical department requested a written statement from Plaintiff's treating physician indicating the current status of his diabetes and whether the physician recommended any work restrictions and/or necessary accommodations, and provided a copy of the job description for his physician to review. In addition, the medical department asked Plaintiff to provide a daily monitoring log of his glucose levels.

Plaintiff's treating physician, Dr. Kelly Caruso, advised the medical department that Plaintiff's blood sugars were well controlled and that his condition

was stable on an insulin pump, and approved Plaintiff for the position "provided he is able to eat regularly scheduled meals and has access to glucose tablets to take as needed for infrequent hypoglycemic episodes." However, on November 18, 2010 – two days after sending her letter to Defendant's medical department – Dr. Caruso entered a notation in Plaintiff's medical record in which she described Plaintiff's blood sugars as "not well controlled with [HgA1C] at 9.3."

The medical department subsequently sought clarification of the frequency of Plaintiff's hypoglycemic episodes and Dr. Caruso's use of the phrase, "regular meals." Dr. Caruso responded that Plaintiff experienced hypoglycemic episodes approximately one to two times per month at night and would "need to eat breakfast, lunch[,] and dinner daily as well as have access to glucose supplementation as needed if he experiences hypoglycemia." She added that Plaintiff's meals would "need to occur [at] regularly scheduled times [each day]."

Upon review of Plaintiff's medical file, Dr. C. Ray Prible, Director of Medical Services for Defendant, determined that Plaintiff did not have good control or stability of his diabetes and that Defendant could not accommodate Dr. Caruso's mandate that Plaintiff be able to eat three regularly scheduled meals each day. Mr. Prible therefore medically disqualified Plaintiff from the position.

### B. Procedural Background

Plaintiff subsequently filed a complaint on June 22, 2012 (Doc. 1) and an amended complaint on October 31, 2012 (Doc. 13), alleging that Defendant discriminated against him on the basis of his Type I diabetes by rescinding his contingent offer of employment based upon review of his pre-placement physical examination, and further alleging that Defendant refused to grant Plaintiff reasonable

accommodation for his disability. Following discovery, Defendant filed a motion for summary judgment (Doc. 24) and brief in support (Doc. 26), asserting that Plaintiff's claims were precluded by Defendant's affirmative defenses of business necessity and direct threat, and that Plaintiff's proposed accommodation of eating three regularly scheduled meals each day was unreasonable and would place an undue hardship on Defendant and its employees. Based on the evidence of record, the court concluded that material issues of facts existed which should be presented to a jury.

A jury trial commenced on February 18, 2014. At the close of the evidence, both parties made motions for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), which the court denied. The jury returned a verdict in favor of Defendant, finding that, although Plaintiff was otherwise qualified for the conductor position, with or without reasonable accommodation, (1) Defendant had not violated the ADA by failing to reasonably accommodate Plaintiff's disability; (2) Defendant's medical guideline constituted a business necessity; and (3) Plaintiff would have posed a direct threat of harm to himself and others. (Doc. 70.)

On March 21, 2014, Plaintiff timely filed the instant post-trial motion for judgment as a matter of law, or, in the alternative, for a new trial. (Doc. 76.) Plaintiff filed his brief in support on April 11, 2014 (Doc. 83), and Defendant filed its response on May 6, 2014[1] (Doc. 87). Thus, the motion is ripe for consideration.

---

[1] The court notes that Defendant's response was untimely filed, as the court's order granting Defendant an extension of time to file the response directed it to do so by May 5, 2014. (*See* Doc. 85.) The court will nevertheless consider Defendant's arguments.

**II.       Legal Standards**

      **A.       Motion for Judgment as a Matter of Law**

Judgment as a matter of law should be used sparingly and may be granted only if, "as a matter of law, the record is critically deficient in that minimum quantity of evidence from which a jury might reasonably afford relief." *Whelan v. Teledyne Metalworking Prods.*, 226 F. App'x 141, 145 (3d Cir. 2007) (quoting *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001)). In deciding whether to grant a Rule 50(b) motion:

> the trial court must view the evidence in the light most favorable to the nonmoving party, and determine whether the record contains the minimum quantum of evidence from which a jury might reasonably afford relief. The court may not weigh evidence, determine the credibility of witnesses or substitute its version of the facts for that of the jury. The court may, however, enter judgment notwithstanding the verdict if upon review of the record, it can be said as a matter of law that the verdict is not supported by legally sufficient evidence.

*Parkway Garage, Inc. v. City of Phila.*, 5 F.3d 685, 691-92 (3d Cir. 1993) (internal quotations and citations omitted). A Rule 50 motion will be granted "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *LePage's Inc. v. 3M*, 324 F.3d 141, 145-46 (3d Cir. 2003) (quoting *Lighting Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)). The question is not whether there is no evidence supporting the nonmoving party, but whether there is evidence upon which the jury could properly find for the nonmoving party. *See Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir. 1993) (citing *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir. 1978)).

### B. Motion for a New Trial

Under Federal Rule of Civil Procedure 59(a)(1)(A), "[t]he court may, on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." The decision whether to grant a new trial following a jury verdict is within the sound discretion of the trial judge. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir. 1992). Courts have granted motions for a new trial where: "(1) there is a significant error of law, to the prejudice of the moving party; (2) the verdict is against the weight of the evidence; (3) the size of the verdict is against the weight of the evidence; or (4) counsel engaged in improper conduct that had a prejudicial effect on the jury." *Todd v. Luzerne Cnty. Children & Youth Servs.*, No. 04-2637, 2011 WL 841429, *2 (M.D. Pa. Mar. 8, 2011) (citing *Maylie v. National R.R. Passenger Corp.*, 791 F. Supp. 477, 480 (E.D. Pa. 1992)). Where the evidence is in conflict, however, and subject to two or more interpretations, the trial judge should be reluctant to grant a new trial. *See Klein v. Hollings*, 992 F. 2d 1285, 1295 (3d Cir. 1993).

The Third Circuit has repeatedly stated that motions for a new trial arguing that the verdict is against the weight of the evidence are proper only "when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Whelan*, 226 F. App'x at 145 (quoting *Grazier v. City of Phila.*, 328 F.3d 120, 128 (3d Cir. 2003)). This "stringent standard" is established "to ensure that a district court does not substitute its judgment on the facts and the credibility of the witnesses

for that of the jury." *Sheridan v. E.I. Dupont de Nemours & Co.*, 100 F.3d 1061, 1076 (3d Cir. 1996). Such an action would effect "a denigration of the jury system and[,] to the extent that new trials are granted[,] the judge takes over, if he does not usurp, the prime function of the jury as the trier of facts." *Id*.

**III.** **Discussion**

Plaintiff's motion raises two legal theories. First, Plaintiff argues that he is entitled to judgment as a matter of law. Alternatively, Plaintiff asserts that he should be granted a new trial. These arguments will be addressed in turn.

### A. **Renewed Motion for Judgment as a Matter of Law**

During the trial, Plaintiff made an oral Rule 50 motion for judgment as a matter of law. Therefore, pursuant to Rule 50(b), the court may reconsider the legal questions raised by those arguments. Plaintiff's position is that, notwithstanding the jury's verdict, he is entitled to judgment as a matter of law against Defendant because the jury's verdict was not supported by sufficient evidence. He offers three grounds in support of his motion:[2] (1) that, based upon the undisputed evidence, Plaintiff was qualified as a matter of law for the conductor position without the need for an accommodation; (2) that the accommodation requested by Plaintiff was reasonable as a matter of law; and (3) that Defendant failed, as a matter of law, to

---

[2] Plaintiff also argues that the court should grant judgment as a matter of law because the business necessity defense was inapplicable to the case and because Plaintiff did not pose a direct threat. (*See* Doc. 83, pp. 13-20.) However, if a Rule 50(a) motion is not made on an issue, a Rule 50(b) motion on the issue is waived. *Williams v. Runyon*, 130 F.3d 568, 571-72 (3d Cir. 1997). At trial, Plaintiff sought judgment as a matter of law on the grounds that he did not require an accommodation and that, even if he did, Defendant could have provided it without undue hardship. (Trial Transcript ("Tr.") pp. 303-04.) He made no motion concerning Defendant's affirmative defenses and, thus, waived any 50(b) argument relating thereto.

carry its burden of proving that the requested accommodation would cause an undue hardship. (Doc. 83, pp. 7-13 of 26.)

An employer must "mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodations would impose an undue hardship on the operation of the business of the [employer]." *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 614 (3rd Cir. 2006) (citing 42 U.S.C. § 12112(b)(5)(A)). "Reasonable accommodations" include measures such as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, . . . and other similar accommodations for individuals with disabilities." *Id*. (citing 42 U.S.C. § 12111(9)). The duty to provide reasonable accommodation is subject to certain limitations. For instance, the ADA does not require an employer to create a new position in order to accommodate an employee with a disability, or to transform a temporary light duty position into a permanent position. *Id*. at 614. Relevant here, an employer is not required to provide a reasonable accommodation if it would pose a "direct threat" to the safety of the applicant or others or, if doing so, would conflict with seniority rules. *Id*. (citing 29 C.F.R. § 1630.15(b)(2) and *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002)).

The issue of reasonable accommodation is a question for the trier of fact. *Id*. The plaintiff must first make a prima facie showing that the proposed accommodation is possible and would have allowed him to perform the essential functions of the job. *See Id.*; *Whelan v. Teledyne Metalworking Prods. & Allegheny Techs., Inc.*, Civ. No. 01-1316, 2006 WL 39156, *4 (W.D. Pa. Jan. 6, 2006). If he has done so, the burden shifts to the defendant to prove, as an affirmative defense,

that the accommodation requested by the plaintiff is unreasonable or would cause undue hardship. *Id*.

Here, there appears to be no question that Plaintiff proposed that he be able to eat three regularly scheduled meals each day. Plaintiff contends, however, that his ability to do so would not require an accommodation because the nature of the work environment permits conductors to eat on the job. Plaintiff further argues that, if enabling Plaintiff to eat three regularly scheduled meals each day would require an accommodation, the accommodation is reasonable as a matter of law because eating is a basic human necessity and employers, including Defendant, routinely provide meal breaks to their employees. To the extent Defendant argues that providing this accommodation would cause undue hardship by causing work stoppage and potentially leading to delays in performances, Plaintiff contends that it is pure speculation that Plaintiff would be prevented from performing his job duties to eat and that allowing Plaintiff a few minutes to do so would result in significant disruption.

Based on the evidence of record, the court concludes that a reasonable jury could have reached the decisions it did in favor of Defendant. Indeed, although the jury found that Plaintiff was "qualified" for the conductor position, Defendant presented evidence that eating three regularly scheduled meals required an accommodation be made and that the accommodation was either unreasonable, would not allow Plaintiff to perform the essential functions of the job, or would create an undue hardship for Defendant. The evidence presented by Defendant included the following: that Defendant's treating physician's written response to Defendant required him to eat three regularly scheduled "meals" each day, which she

explained as eating "breakfast, lunch, and dinner daily" (*see* Doc. 87-1, p. 23 of 24); that the treating physician's description of a "meal" at trial – *i.e.*, simply taking glucose tablets, drinking a soda, or having a snack – differed from her original explanation, as stated above, and from the ordinary meaning of the word (*see* Tr. 84-85, 91-92); that Plaintiff twice admitted on the stand that he knew Defendant could not provide him the opportunity to eat regularly scheduled meals (Tr. 69-70); that extraboard conductors work unpredictable and erratic schedules (Tr. 135, 156, 178-80, 225); that, although the collective bargaining agreement provides for meal breaks, the yardmaster does not always provide such breaks (Tr. 129, 186, 204, 238-40); and that conductors may or may not have the opportunity to eat on the job (*see* Tr. 131, 206, 235). From this evidence, it was a rational conclusion that, given the circumstances, Defendant could not guarantee Plaintiff the ability to eat meals at regularly scheduled times each day, as required by his treating physician.

Moreover, Defendant also presented sufficient evidence that the accommodation would present an undue hardship. An undue hardship may result when an accommodation would be disruptive to the business or the ability of other employees to work. *See Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1125 (10th Cir. 1995) ("An accommodation that would result in other employees having to work harder or longer hours is not required."). At trial, Defendant presented evidence that the railroad business is time sensitive in terms of getting trains in and out of the yard and keeping deliveries on schedule. (Tr. 184-87). Defendant argued that Plaintiff's meal breaks would result in the work stopping for Plaintiff and his coworkers and presented testimony that delayed deliveries would result in the loss of customers. (Tr. 185-86.) Finding consistent with Defendant's argument was rational, and

accordingly, the jury's finding in this regard provides no basis to overturn the verdict.

In sum, the court finds that the jury had sufficient evidence to support its ultimate decision that Defendant did not deny Plaintiff a reasonable accommodation for his disability.[3]

### B. Plaintiff's Motion for a New Trial Pursuant to Rule 59

In the alternative, Plaintiff argues that a new trial should be granted because the jury's verdict was against the great weight of the evidence and because the court erroneously instructed the jury on the business necessity defense. In support of his argument that the verdict for Defendant was against the great weight of the evidence, Plaintiff reiterates the same facts and legal arguments made in support of his renewed motion for judgment as a matter of law, but properly incorporates arguments relating to Defendant's affirmative defenses of business necessity and direct threat. For the reasons stated above, the verdict in Defendant's favor on Plaintiff's reasonable accommodation claim was not against the great weight of the evidence. Likewise, for the reasons that follow, the evidence supported the jury's findings that Defendant established its entitlement to the business necessity and direct threat defenses.

---

[3] Assuming, *arguendo*, that the jury's conclusions in this regard were not supported by sufficient evidence, the verdict would nevertheless stand because the jury found that Defendant's medical guideline for diabetic employees is a business necessity and that Plaintiff would have posed a direct threat. As stated above, Plaintiff did not make a 50(a) motion on these defenses and, therefore, the jury's verdict cannot be reversed. (*See* Verdict Form, Doc. No. 70 (regardless of answer to Question No. 2, the jury was instructed to proceed to Question Nos. 3 and 4).)

### 1. **Business Necessity Defense**

The purpose of the business necessity defense is well established and was set forth at length in the court's memorandum on Defendant's motion for summary judgment. *See Bender*, 2014 WL 131638 at *9-12. To benefit from this affirmative defense, an employer must prove that the pertinent qualification standard is job-related for the position in question, is consistent with business necessity, and cannot be met by a person with the plaintiff's disability even with a reasonable accommodation. *Verzeni v. Potter*, 109 F. App'x 485, 490 (3d Cir. 2004). A qualification standard is job related if it "is necessary and related to the 'specific skills and physical requirements of the sought-after position'" and it is a business necessity if "a business reason makes necessary the use of a test or criteria in hiring or promotional decision making." *Atkins v. Salazar*, 677 F.3d 667, 682 (5th Cir. 2011).

In the matter *sub judice*, Plaintiff contends that the defense is inapplicable to this case and should not have been given as a jury instruction. In support of his contention, Plaintiff first argues that Defendant's medical guideline was not in existence at the relevant time, and, therefore, the jury's finding that there was a business necessity for such a guideline was pure speculation. Much to Plaintiff's chagrin, however, the evidence produced at trial showed that a guideline did, in fact, exist. Defendant introduced its medical guideline into evidence, which provides, in pertinent part, as follows:

> FTE Applicants - Diabetes on Insulin
> Per Dr. Prible, March 2011
> Recommended Med [Disqualification] if HgA1c is ≥ 9
> (eg., requiring a minimum 12 week period to obtain repeat
> HgA1c to help establish control and stability).

(Doc. 87-1, p. 2 of 24.)[4]  Plaintiff argues that the guideline clearly indicates that it was not in effect when he was disqualified since it reads, "Per Dr. Prible, March 2011" and Plaintiff was disqualified in December 2010.  When questioned about this discrepancy at trial, Dr. Prible testified that the above guideline was, indeed, in effect at the time of Plaintiff's disqualification, and his testimony is corroborated by Defendant's request for information relevant to the guideline during Plaintiff's medical evaluation and by notes related to the guideline on two documents contained in Plaintiff's file.  (*See* Tr. 257-60, 264-65, 288.)  Based on this evidence, the court sees no reason to disturb the jury's finding that the medical guideline was in effect at the time of Plaintiff's disqualification.

Plaintiff also argues that, in the event there was a medical guideline in place, it nevertheless was an invalid blanket exclusion.  This argument is also without merit.  The medical guideline's preamble specifically states that "Qualification determinations are based on an individualized assessment of each case."  (Doc. 87-1, p. 2 of 24.)  This preamble was corroborated by evidence presented at trial, and supported the conclusion that the guideline was not a blanket exclusion.[5]  Dr. Prible testified that, in assessing the stability and control of a

---

[4] In addition, the fourth page of the guideline, titled "Glucose (Blood)," equates HgA1C levels to average blood glucose levels and provides a recommended blood sugar range for individuals with diabetes.  (*Id*., p. 5 of 24.)  Citing the American Diabetes Association, the guideline states that "Good control and stability of Diabetes can be demonstrated by having blood sugar levels consistently less than 180 mg/dL one to two hours after the start of a meal, or between 70 to 130 mg/dL before a meal, and a Hemoglobin A1c level less than or equal to 7%."  (*Id*.)

[5] In a somewhat confounded argument, Plaintiff contends that the concept of an individualized assessment is inconsistent with the application of a guideline and, therefore, the preamble language requiring an individualized assessment renders the guideline meaningless.  (Doc. 83, p. 15 of 26.)  However, Plaintiff also argues that the medical guideline is invalid because it does not meet the Act's requirement for and focus upon an individualized assessment.  (*Id*. at p. 16 of 26.)  Because the
(continued...)

diabetic candidate's condition, the medical department looks at a number of factors, including HgA1C and blood glucose levels, compliance with treatment, and whether the individual experiences hypoglycemic episodes. (Tr. 262-63, 269, 276.) As outlined in the guideline's addendum, the medical department also requests information from treating physicians, including laboratory results, fasting blood glucose and periodic HgA1C levels, progress reports and office visit notes, and whether the individual experiences significant hypoglycemic episodes. (Doc. 87-1, p. 13 of 24.) Dr. Prible testified that this information enables the department to make a proper assessment of the individual and noted that no one factor alone controls the department's decision as to whether they should medically disqualify a candidate. (Tr. 262.) Consistent with Dr. Prible's testimony and the guideline's addendum, the evidence showed that Defendant requested the above information from Plaintiff and that, despite Plaintiff's HgA1C level of 8.9, Defendants sought additional information from his treating physician in order to fully evaluate the overall state of his condition. Moreover, and rather significant to this defense, despite disqualifying Plaintiff, three insulin-dependent diabetic employees testified that they held safety sensitive positions with Defendant because the medical department assessed their individual conditions and determined that they were fit for duty despite their diabetes.[6] (*See* Tr. 214-15, 226, 232.) Thus, the jury had ample evidence to

---

(...continued)
rescission of a conditional job offer due to the failure to meet the requirements of a guideline must be based on an individualized assessment of the objective evidence that an applicant's impairments affected his ability to safely perform the essential functions of the job, *Chevron U.S.A. Inc., v. Echazabal*, 536 U.S. 73, 86 (2002), the court will address whether Defendant properly made an individualized assessment.

[6] This evidence also shows that, contrary to Plaintiff's argument that the medical guideline
(continued...)

conclude that the guideline did not constitute an invalid blanket exclusion on diabetics.

Plaintiff also appears to argue that the guideline was unreasonable because a diabetic's HgA1C level is not indicative of his overall well-being or propensity for hypoglycemia. (*See* Doc. 83, pp. 16-19.) Despite Plaintiff's reliance on inadmissible evidence to support his argument, the court nevertheless has considered the argument and finds Plaintiff's position unpersuasive. The evidence presented at trial clearly demonstrated the correlation between HgA1C levels and episodes of hypoglycemia and/or hyperglycemia, and Plaintiff's own physician testified as to the dangers presented by both hypo- and hyperglycemic episodes. (*See* Tr. 81-86.)

In conclusion, the evidence presented at trial establishes the existence of a guideline. Thus, the court's instructing the jury on business necessity was appropriate.[7] (*See* Tr. 16.) The court is confident that the jury's verdict was supported by sufficient evidence and was in accordance with the weight thereof.

### 2. **Direct Threat**

In addition to the business necessity defense, Defendant also raised the affirmative defense of direct threat to Plaintiff's claims of discrimination. As the

---

[6] (...continued)
catered to stereotypes against diabetes, Defendant did not arbitrarily deny employment to all diabetics; rather, the medical department relied on certain factors in an effort to address each individual's condition and make an employment decision based on their assessment of the individual's fitness for a safety-sensitive position.

[7] Although Plaintiff contends that the court should not have instructed the jury on the business necessity defense, he did not object to the court's wording of the charge. Assuming that he had objected on this ground, the court notes that its wording was derived entirely from the Third Circuit's guidance, as provided in *Verzeni*, 109 F. App'x at 491-92, on instructing a jury on the business necessity defense.

court discussed in its memorandum on Defendant's motion for summary judgment, both defenses are very similar in nature. While business necessity focuses on the pertinent qualification standard and assesses whether it can be justified by an across-the-board requirement pertaining to all employees, direct threat focuses on the individual employee and examines the specific risk posed by his or her disability. *See Bender*, 2014 WL 131638 at *13 (citing *E.E.O.C. v. Exxon Corp.*, 203 F.3d 871, 875 (5th Cir. 2000)). In determining the applicability of this defense, the jury was instructed to consider the characteristics of the harm allegedly posed by Plaintiff, including: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that potential harm will occur; and (4) the imminence of potential harm. 20 C.F.R. § 1630.2(r); *School Bd. of Nassau Cnty., Fl. v. Arline*, 480 U.S. 273, 279 (1987).

First, with respect to the question of the duration of the risk, the trial evidence showed that the risk Plaintiff posed was permanent. Dr. Caruso's November 19, 2010 letter stated that Plaintiff experienced up to two hypoglycemic episodes each month. Dr. Caruso testified that Plaintiff's hypoglycemic episodes were significant and resulted in Plaintiff exhibiting sweatiness, shakiness, and a racing heart rate. (Tr. 19-25, 37, 99-100.) Plaintiff contended that he never had any symptoms of severe hypoglycemia and, while he occasionally experienced mild hypoglycemia at night, he was able to recognize the event and treat it promptly. In essence, he argued that the risk is only of short duration. The jury was entitled to reject Plaintiff's contradictory evidence and reasonably conclude that the risk was of significant duration.

The second factor of the analysis, *i.e.*, the nature and severity of the harm, does not appear to be in dispute, as Plaintiff concedes that the potential harm could be severe.[8] (*See* Doc. 83, p. 22 of 26.)

With respect to the third factor, *i.e.*, the likelihood of the potential harm, Defendant argues that, while the potential harm cannot be determined with mathematical certainty, the risk of harm is real, pointing to Plaintiff's testimony that his hypoglycemic symptoms can last up to fifteen minutes after he takes glucose, which, according to Defendant, is more than sufficient time for his diminished focus and diverted attention to cause horrific consequences. In response, Plaintiff argues that he is aware of the symptoms of his hypoglycemia and can effectively manage his condition such that there is no risk of incapacitation. The court finds that, based on the evidence, a reasonable jury could conclude that Plaintiff posed a significant likelihood of harm, especially in light of the Third Circuit's directive that, "[i]f the threatened harm is grievous, . . . even a small risk may be "significant." *Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 231 (3d Cir. 2000).

For similar reasons, the evidence supported a finding that Plaintiff posed an imminent risk of harm, a consideration addressed by the fourth factor. Plaintiff experienced up to two hypoglycemic episodes each month, and an inability to eat on a regular basis combined with physical exertion increases the risk of a hypoglycemic event. (*See* Tr. 38, 201.) Thus, the court will not disturb the jury's verdict on this basis.

---

[8] Plaintiff acknowledges that an accident involving a train could cause severe harm but focuses his argument on the "severity of the risk, not the severity of the harm." (*See* Doc. 83, p. 22 of 26.) The proper inquiry, however, is severity of harm.

Accordingly, the overwhelming evidence presented at trial established that the railroad environment is dangerous and requires constant vigilance, and that an accident involving a train can result in deadly harm. The evidence also showed the necessity for a medical guideline that seeks to ensure the health and fitness of individuals working in safety sensitive positions and that Plaintiff failed to meet the guideline's requirements. Thus, the evidence supported the finding that Plaintiff constituted a direct threat and, therefore, the jury's verdict will not be disturbed.

**IV.** **Conclusion**

Based on the evidence offered at trial, this is not a situation in which a reasonable jury could only have decided in favor of Plaintiff. Instead, Defendant offered sufficient evidence from which a jury could find in its favor on each of Plaintiff's claims of discrimination. Therefore, the court will not disturb the jury's findings and will allow the judgment to stand. Accordingly, Plaintiff's motion for a judgment as a matter of law and motion for a new trial will be denied.

                                         s/Sylvia H. Rambo
                                         United States District Judge

Dated: July 8, 2014.